UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. FRED L. PASTERNACK,

                Plaintiff,

    v.

LABORATORY CORPORATION OF
AMERICA a/k/a LABCORP and CHOICEPOINT,
INC.,

                Defendants.

```
┌──────────────────────────────┐
│ USDC SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #:_____ │
│ DATE FILED: 9/6/12            │
└──────────────────────────────┘
```

**MEMORANDUM**
**OPINION & ORDER**

10 Civ. 4426 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      Plaintiff Fred Pasternack commenced this action against Laboratory Corporation

of America ("LabCorp") and ChoicePoint, Inc.[1] on June 3, 2010. The Amended Complaint

includes claims for negligence, gross negligence, negligent misrepresentation, and fraud, as well

as claims under Section 1983. (Dkt. No. 10) LabCorp answered the Amended Complaint, but

ChoicePoint moved to dismiss. (Dkt. No. 16) In an August 1, 2011 Memorandum Opinion and

Order, this Court granted ChoicePoint's motion to dismiss in its entirety. (Dkt. No. 22;

Pasternack v. Laboratory Corp. of America, No. 10 Civ. 4426(PGG), 2011 WL 3478732

(S.D.N.Y. Aug. 1, 2011)). In September 2011, Plaintiff retained new counsel. (Dkt. No. 29)

      Pasternack now seeks leave to file a Second Amended Complaint ("SAC"). In the

proposed SAC, Pasternack attempts – as to ChoicePoint – to address the deficiencies that led to

the dismissal of his negligence and gross negligence claims in the August 1, 2011 Opinion. As

to LabCorp, the SAC again pleads negligence, gross negligence, negligent misrepresentation,

---

[1] Reed Elsevier Inc. acquired ChoicePoint and all of its subsidiaries in September 2008. As a
result, ChoicePoint's drug testing services are now offered by LexisNexis Occupational Health
Solutions. (Def. Br. 1 n.1) Pasternack names LexisNexis in the caption of his proposed SAC,
but refers to the Defendant as ChoicePoint. For ease of reference, the Court will refer to
ChoicePoint.

and fraud.  The SAC omits the Amended Complaint's Section 1983 claim, however, and adds a

claim for "injurious falsehood."  (Am. Cmplt.; SAC)

      LabCorp does not oppose Pasternack's motion to file a Second Amended

Complaint; ChoicePoint opposes Plaintiff's motion.  For the reasons stated below, Pasternack's

motion for leave to file a Second Amended Complaint will be granted as to LabCorp but denied

as to ChoicePoint.

**BACKGROUND**

**I.**    **FEDERAL LAW GOVERNING THE DRUG
     TESTING OF AVIATION EMPLOYEES**

      Because the regulatory scheme governing the testing of aviation employees is

critical to an understanding of Pasternack's claims, the Court includes a summary of that scheme

and certain relevant regulations.

      The Federal Aviation Administration ("FAA") and the U.S. Department of

Transportation ("DOT") have issued regulations concerning the drug testing of aviation

employees.  The Second Circuit outlined the regulatory scheme in Drake v. Lab. Corp. of Am.

Holdings, 458 F.3d 48 (2d Cir. 2006):

> In the FAA Act, Congress granted the FAA broad authority over aviation safety,
> including the power to adopt regulations that it "finds necessary for safety in air
> commerce and national security."  49 U.S.C. § 44701(a)(5).  Pursuant to this power, in
> 1988, the FAA promulgated regulations mandating that all aviation-industry employees
> who perform safety-sensitive functions be subjected to random drug-testing.  See Anti–
> Drug Program for Personnel Engaged in Specified Aviation Activities, 53 Fed.Reg.
> 47024 (Nov. 21, 1988) (codified as amended at 14 C.F.R. pt. 121, App. I).  The
> regulations set forth in great detail the "standards and components" that required drug-
> testing programs must include.  See 14 C.F.R. pt. 121, App. I.  They prescribe, among
> other things, the classes of employees that must be tested, 14 C.F.R. pt. 121, App. I § III,
> the substances for which they must be tested, id. § IV, the types of testing to be
> conducted (e.g., pre-employment testing, random testing, and post-accident testing), id. §
> V, and the length of time that records of required drug testing must be retained, id. § VI.
>
> The FAA regulations incorporate by reference DOT regulations that set out detailed
> protocols to be followed by drug-testing laboratories.  See id. § I.B. (requiring that

2

aviation employers comply with "Procedures for Transportation Workplace Drug Testing Programs," 49 C.F.R. pt. 40, published by the DOT). The DOT regulations provide, among other things, that laboratories must use chain-of-custody procedures to document each time a urine specimen is handled or transferred, see 49 C.F.R. § 40.83(b), that an employer's designated MRO [Medical Review Officer] must review and certify test results before the laboratory reports them to the employer, id. § 40.97(b); id. § 40.123, and that laboratories must report test results to an MRO in writing, id. § 40.97(b). Although they set out elaborate rules for conducting drug tests, the DOT regulations do not specifically address negligence on the part of drug-testing laboratories or otherwise establish the minimum standard of care to be exercised by laboratory personnel.

Drake, 458 F.3d at 56-57.

The dispute between the parties concerns the consequences of Pasternack's initial failure to provide an adequate urine sample when randomly chosen for a drug test, and his decision to leave the collection facility before the collection process was complete. Two DOT regulations explicitly provide that where an employee leaves a collection site before the collection process is complete, that conduct constitutes a "refusal to test":

> **40.193 What happens when an employee does not provide a sufficient amount of urine for a drug test?**
>
> (a) This section prescribes procedures for situations in which an employee does not provide a sufficient amount of urine to permit a drug test (i.e., 45 mL of urine).
>
> (b) As the collector, you must do the following:
>
> (1) Discard the insufficient specimen, except where the insufficient specimen was out of temperature range or showed evidence of adulteration or tampering (see § 40.65(b) and (c)).
>
> (2) Urge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a sufficient urine specimen, whichever occurs first. It is not a refusal to test if the employee declines to drink. Document on the Remarks line of the CCF [Custody and Control Form] (Step 2), and inform the employee of, the time at which the three-hour period begins and ends.
>
> (3) If the employee refuses to make the attempt to provide a new urine specimen or leaves the collection site before the collection process is complete, you must discontinue the collection, note the fact on the "Remarks" line of the CCF (Step 2), and immediately notify the DER [Designated Employer Representative]. This is a refusal to test.

49 C.F.R. § 40.193 (emphasis added).

3

**40.191 What is a refusal to take a DOT drug test, and what are the consequences?**

(a) As an employee, you have refused to take a drug test if you:

...

(2) Fail to remain at the testing site until the testing process is complete. . . .

49 C.F.R. § 40.191(a)(2).

## II.    PASTERNACK'S DRUG TEST

Pasternack is a physician and part-time pilot. (SAC ¶¶ 1, 3)  From 1978 until February 2008, Pasternack was a Senior Aviation Medical Examiner ("AME") for the FAA. (Id. ¶ 10)  In this capacity, Pasternack performed medical examinations that the FAA requires pilots to undergo in order to maintain certain certifications. (Id. ¶ 10)  He also piloted chartered flights for Northeastern Aviation Corporation ("Northeastern"). (Id. at 11)  Pasternack received compensation both as an AME and as a Northeastern pilot. (Id. ¶¶ 10-11)

Defendant ChoicePoint, Inc. provides, among other services, drug testing administration programs to both governmental and private entities. (Id. ¶ 4)  Defendant LabCorp provides "specimen collection and laboratory drug testing services to private entities." (Id. ¶ 5)  ChoicePoint entered into a contract with Northeastern in which it agreed to "help administer Northeastern's drug testing program." (Id. ¶ 16)  LabCorp entered into a contract with ChoicePoint in which it agreed to "perform specimen collection and testing services, which included specimen collection and testing services for Northeastern." (Id. ¶ 17)

On June 1, 2007, Northeastern notified Pasternack that he had been selected for random drug testing. (Id. ¶ 18)  On June 5, 2007, Pasternack appeared for drug testing at a LabCorp collection site located at 1317 Third Avenue in Manhattan at approximately 1:10 p.m. (Id. ¶ 19)  Pasternack brought with him a pre-printed chain-of-custody form ("CCF") provided to

4

him by Northeastern, as DOT regulations require. (Id. ¶ 19)  Pasternak "attempted to provide a urine sample," but was unable to produce "a sufficient amount of urine." (Id. ¶ 20)  The LabCorp collector, Theresa Montalvo, instructed Pasternack to go to the waiting room. (Id. ¶ 22) Pasternack told Montalvo that he needed to leave the collection site in order to attend to a patient, but that he would return the following morning to provide an adequate sample. (Id. ¶¶ 23-24)  Although DOT regulations require sample collectors such as LabCorp to tell a subject that "he or she is not permitted to leave the collection site and if they do so, that it will be considered a refusal to test," Montalvo did not so instruct Pasternack. (Id. ¶ 21 (quoting DOT Guidelines § 8.3))  Pasternack then left the collection site. (Id. ¶ 24)

Shortly after 4:00 p.m. that same day, Pasternack returned to the LabCorp facility. After calling Northeastern and obtaining permission to take a second urine sample from Pasternack, Montalvo noted on the CCF that "Dr. Pasternack had left and returned and also noted that Northeastern approved the second collection." (Id. ¶ 28)  Pasternack then provided an adequate urine sample. (Id. ¶ 29)  LabCorp analyzed the sample, which tested negative for prohibited drugs. (Id. ¶ 31)  LabCorp sent the results, along with the CCF, to ChoicePoint. (Id. ¶ 31)

Dr. Melvin Samuels was the Medical Review Officer ("MRO") at ChoicePoint responsible for reviewing Pasternack's laboratory results. (Id. ¶¶ 31-32)  DOT regulations provide that an MRO is "a licensed physician . . . who is responsible for receiving and reviewing laboratory results . . . and evaluating potential medical explanations for certain drug test results." 49 C.F.R. § 40.3. (Id. ¶ 32)  Based on the CCF, MRO Samuels determined that Pasternack had left the collection site before the test was completed, and that this conduct constituted a "refusal to test." (Id. ¶¶ 35-36)  On June 15, 2007, in response to an inquiry from Northeastern

concerning Pasternack's drug test, ChoicePoint reported that there had been a "refusal to test." (Id. ¶ 38)  ChoicePoint also notified the FAA that Pasternack had refused his drug test.  (Id. ¶ 40)

In an Emergency Order dated November 20, 2007, the FAA revoked all of Pasternack's airman certificates on the basis that he refused to take a drug test, allegedly relying on Montalvo's statements and ChoicePoint's "refusal to test" determination.  (Id. ¶ 45)  On February 21, 2008, the FAA terminated Pasternack's AME designation, citing his refusal to submit to a random drug test.  (Id. ¶ 45)  "As a result, Dr. Pasternack has been unable to pilot any flights or perform pilot medical examinations or function as an AME."  (Id.)  Pasternack claims that because of Defendants' actions, he "has lost, and continues to lose, income that he would have earned by continuing to pilot aircraft for Northeastern and Skytypers" and has lost "a major portion of his income as a physician, including [compensation he would have received for] administration of FAA medical examinations and consultations as an AME."  (Id. ¶ 48)

### III.    PASTERNACK'S CHALLENGE TO THE FAA'S ACTION

As noted above, on November 20, 2007, "the FAA revoked all of [Pasternack's] airm[a]n certificates,"[2] and on February 21, 2008, the FAA terminated his medical examiner designation, citing his "'unacceptable lack of regard for the importance of Federal Aviation Regulations'"and his "'refusal to take a random drug test.'"  (SAC ¶ 45; Am. Cmplt. ¶ 25) "Pasternack appealed the termination of his [medical examiner] designation, but that appeal was denied."  (Am. Cmplt. ¶ 26)  He likewise challenged the revocation of his pilot certificates. (SAC ¶ 46)  An administrative law judge ("ALJ") upheld the revocation, however, as did the

---

[2]  "[T]he FAA grants permission to pilot aircraft through the issuance of airman certificates of various types.  NTSB definitions provide that '[a]irman certificate' means any certificate issued by the FAA to an airman and shall include medical certificates required for an airman." Bullwinkel v. U.S. Dep't of Transp., FAA, 787 F.2d 254, 256 (7th Cir. 1986) (quoting 49 C.F.R. § 821.1) (citations omitted).

National Transportation Safety Board ("NTSB").  (SAC ¶ 46; Am. Cmplt. ¶ 26) Pasternack then

appealed to the United States Court of Appeals for the District of Columbia. The D.C. Circuit

found that the NTSB's determination was not supported by substantial evidence, vacated the

decision, and remanded to the NTSB.  (Id.)

On September 2, 2010, the NTSB remanded the case to Chief ALJ William E.

Fowler to "make, clarify and expound upon those credibility determinations, findings of fact,

and conclusions of law that are pertinent to an assessment of whether respondent refused to

undergo drug testing under 49 C.F.R. § 40.191."  (See J. Randolph Babbitt, Administrator,

Federal Aviation Administration v. Fred Leroy Pasternack, Decisional Order on Remand,

Docket SE–18133RM at 2 (hereinafter "Apr. 8, 2011 ALJ Decision"))  On the basis of a full

evidentiary hearing, the ALJ affirmed the FAA administrator's order revoking Pasternack's

airman certificates, concluding that he had "refused to take a DOT drug test under the

provisions of 49 C.F.R. § 40.191(a)(2) on June 5, 2007" and "by virtue of his refusal . . . has

demonstrated that he lacks the qualifications required to hold, and exercise the privileges of, any

certificate or rating issued under [Federal Aviation Regulations] Part 61."[3]  (Apr. 8, 2011 ALJ

Decision at 20–21)

The current status of Pasternack's challenge to the FAA's actions has not been

addressed by the parties.  According to the SAC, Pasternack's "administrative appeal remains

---

[3]  In his findings of fact, the ALJ noted that Pasternack had served as an MRO for approximately
16 years, that he had received training on substance abuse from ChoicePoint in 2005, that
"[s]uch training included instruction that leaving a drug testing facility without providing an
adequate urine sample constitutes a drug test refusal," and that "[b]y virtue of both such training
and his experience as an MRO, [Pasternack] knew or should have known that he was, under the
applicable regulations, refusing a drug test when he departed the Lab Corp testing facility . . . on
June 5, 2007."  (Apr. 8, 2011 ALJ Decision at 20)

open after multiple proceedings before the ALJ, the National Transportation Safety Board, and

the D.C. Circuit." (SAC ¶ 47)

## IV.   THE PRIOR DISMISSAL OF PASTERNACK'S NEGLIGENCE CLAIMS AGAINST CHOICEPOINT

The essence of Pasternack's claims against ChoicePoint in the Amended

Complaint is that "ChoicePoint wrongfully designated Pasternack as a 'refusal to test' on the

CCF [i.e., the chain of custody form], which designation, in turn, was solely responsible for the

FAA's revocation of Pasternack's airmen certificates as well as his AME designation." (Am.

Cmplt. ¶ 197). Pasternack claimed that ChoicePoint made this erroneous designation "based

upon an arbitrary and idiosyncratic determination that a procedural irregularity destroyed the

integrity of the urine sample Pasternack provided." (Am. Cmplt. ¶ 196)

In dismissing Pasternack's negligence claims against ChoicePoint, the Court

began its analysis by setting out the elements of negligence under New York law and by noting

that the scope of the duty owed to a plaintiff presents a question of law:

> "Under New York law, which applies to this case, 'a plaintiff must establish three
> elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part
> as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"
> Farash v. Cont'l Airlines, Inc., 574 F.Supp.2d 356, 367 (S.D.N.Y. 2008) (quoting Alfaro
> v. Wal–Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000)).

> "The existence of a duty is an essential element of a negligence claim because, '[i]n the
> absence of a duty, as a matter of law, no liability can ensue.'" Farash, 574 F.Supp.2d at
> 367 (quoting McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)). "A plaintiff
> must show more than a duty owed to a potentially limitless class of people, but rather a
> specific duty owed to the plaintiff." Gen. Star Indem. Co. v. Platinum Indem. Ltd., No.
> 00 CIV. 4960(LMM)(GWG), 2002 WL 31159106, at *3 (S.D.N.Y. Sept. 27, 2002)
> (citing Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232 (N.Y. 2001) ("injured party
> must show that a defendant owed not merely a general duty to society but a specific duty
> to him or her"); Lauer v. City of New York, 95 N.Y.2d 95, 100 (N.Y. 2000) ("[w]ithout a
> duty running directly to the injured person there can be no liability in damages, however
> careless or foreseeable the harm")). As the Second Circuit has emphasized, "in New York
> . . . 'the judicial power to modify the general rule' of ordinary care 'is reserved for very

limited situations' and is not to be 'exercise[d] ... on an ad hoc basis.'" Alfaro, 210 F.3d
at 115 (quoting Stagl v. Delta Airlines, Inc., 52 F.3d 463, 469 (2d Cir. 1995)).

The scope of the duty owed to a plaintiff is a question of law, see Palka v. Servicemaster
Mgmt. Servs. Corp., 83 N.Y.2d 579, 585 (N.Y. 1994) ("the definition of the existence
and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration
reserved for judges to make prior to submitting anything to fact-finding or jury
consideration" (citations omitted)). The determination of whether a party breached its
duty of care may also be decided as a matter of law. See Alfaro, 210 F.3d at 116 ("we
hold that Wal-Mart's alleged breach – failing to assist Alfaro in a timely manner – was
outside the scope of its duty to Alfaro"); see also Blye v. Manhattan & Bronx Surface
Transit Operating Auth., 124 A.D.2d 106, 109 (1st Dept. 1987) ("Whether or not in a
given case a breach of duty has occurred will depend on the particular facts of the case
and is either a question of law or of fact depending on the susceptibility of the facts to
varying inferences. The facts at bar, which are not susceptible to varying interpretations,
enable us to determine, as a matter of law, whether a breach of duty of care has
occurred." (citing Sheehan v. City of New York, 40 N.Y.2d 496, 502 (N.Y. 1976);
Palsgraf v. Long Island Railroad Company, 248 N.Y. 339, 345 (N.Y. 1928); Amoruso v.
New York City Transit Authority, 12 A.D.2d 11, 12 (1st Dept. 1960)).

Pasternack, 2011 WL 3478732, at *8.

The Court then discussed the Drake trilogy of cases, which analyze the liability of

drug testing laboratories and MROs for negligence in conducting and evaluating drug tests. See

Drake v. Lab. Corp. of Am. Holdings, 290 F.Supp.2d 352 (E.D.N.Y. 2003) ("Drake I"), Drake v.

Lab. Corp. of Am. Holdings, 458 F.3d 48 (2d Cir. 2006) ("Drake II"), and Drake v. Lab. Corp. of

Am. Holdings, No. 02–CV–1924 (FB)(RML), 2007 WL 776818 (E.D.N.Y. Mar. 13. 2007)

("Drake III"). The Court concluded that "Drake II indicates that federal law does not preempt a

state law negligence claim against a drug testing entity or administrator where the plaintiff seeks

to recover for alleged violations of federal regulations. Because Pasternack's negligence claims

are predicated on ChoicePoint's alleged violations of DOT regulations, those claims are not

preempted by federal law." Pasternack, 2011 WL 3478732, at *11. The Court concluded that

Pasternack's negligence claims suffered from a number of other defects, however:

9

As an initial matter, the Amended Complaint does not allege that ChoicePoint or Dr. Samuels communicated the "refusal to test" determination to anyone. Accordingly, it is entirely unclear what action ChoicePoint took that damaged Pasternack.

Secondly, the duty of care discussed in Drake III [and related cases] arises from a contractual relationship between a service provider and an employer. Here, the Amended Complaint does not allege that ChoicePoint had a contractual relationship with Pasternack's employer, Northeastern Aviation Corp. Accordingly, the initial factual predicate for finding a duty of care is not present here, and its absence requires dismissal of Pasternack's negligence claims.

Assuming arguendo that Pasternack could plead facts demonstrating that (1) ChoicePoint communicated its "refusal to test" determination to someone; (2) that this communication caused harm to Pasternack; and (3) there was a contractual relationship between ChoicePoint and Northeastern, a finding that Dr. Samuels – ChoicePoint's MRO – had a duty of care to Pasternack arising out of his obligation to properly interpret the DOT regulation regarding a "refusal to test," would represent a significant extension of precedent. Drake III, Santiago[ v. Greyhound Lines, Inc., 956 F.Supp. 144, 153 (N.D.N.Y. 1997)], and Coleman[ v. Town of Hempstead, 30 F.Supp.2d 356, 365 (E.D.N.Y. 1999)] all involve a direct mishandling of plaintiff's urine specimen: in Drake III, the MRO allegedly sent the wrong sample to the laboratory; in Coleman, Lab Corp. allegedly failed to maintain the seal on plaintiffs urine sample; and in Santiago, the defendant doctor did not properly label the specimen and did not maintain chain of custody. Here, the Amended Complaint does not allege that ChoicePoint in any way mishandled Pasternack's urine sample. Instead, Pasternack claims that ChoicePoint's MRO misinterpreted a DOT regulation. Pasternack has not cited any law demonstrating that such a misinterpretation can provide the basis for a negligence claim.

Finally, assuming arguendo that Pasternack could plead facts showing that a contract existed between Northeastern and ChoicePoint, that ChoicePoint breached that contract, and that in breaching the contract ChoicePoint violated a duty of care to Pasternack not to misinterpret the DOT regulation governing a "refusal to test," the Amended Complaint fails to articulate a plausible theory as to how ChoicePoint misinterpreted the "refusal to test" regulation. See Iqbal, 129 S.Ct. at 1949.

While the Amended Complaint asserts that ChoicePoint violated numerous federal regulations, the method by which it allegedly violated those regulations involves solely the MRO's determination that Pasternack's conduct constitutes a "refusal to test." The applicable federal regulations, however, explicitly provide that where an employee leaves a collection site before the collection process is complete, that conduct constitutes a "refusal to test."

For example, 49 C.F.R. § 40.191(a)(2) states that "[a]s an employee, you have refused to take a drug test if you ... [f]ail to remain at the testing site until the testing process is complete." Similarly, 49 C.F.R. § 40.193 provides that "[i]f the employee ... leaves the collection site before the collection process is complete. . . . [t]his is a refusal to test."

While Pasternack alleges that MRO Samuels made "an arbitrary and idiosyncratic determination" in concluding that Pasternack's departure from the collection site constituted a "refusal to test" (Am.Cmplt.¶ 196), the plain language of the applicable regulations requires such a determination. Pasternack has not presented a plausible theory as to how MRO Samuels' determination constitutes a misinterpretation of these regulations, much less that he was negligent in making this determination.

Pasternack, 2011 WL 3478732, at *12-13.

## DISCUSSION

## I.     STANDARD FOR GRANTING LEAVE TO AMEND

Under the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] . . . when justice so requires." Fed.R.Civ.P. 15(a)(2). District courts "ha[ve] broad discretion to decide whether to grant leave to amend." Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000).

A court may properly deny leave to amend in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2007) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of New York, No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

An amendment is futile where it is legally insufficient on its face such that the amended claim could not survive a motion to dismiss. Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002). A claim can only withstand a Rule 12(b)(6) motion, of course, if it contains

11

sufficient facts to "'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129

S.Ct. 1937, 1960 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Delay alone, in the absence of bad faith or prejudice, is not a sufficient reason for

denying a motion to amend. Ruotolo, 514 F.3d at 191. A court may, however, "deny leave to

amend 'where the motion is made after an inordinate delay, no satisfactory explanation is offered

for the delay, and the amendment would prejudice' other parties." Grace v. Rosenstock, 228

F.3d at 53-54; see also MacDraw, Inc. v. CIT Group Equip. Fin., 157 F.3d 956, 962 (2d Cir.

1998) (internal quotation marks omitted); Urban Box Office Network, Inc. v. Interfase

Managers, L.P., 232 F.R.D. 169, 171-72 (S.D.N.Y. 2004) (quoting Rotter v. Leahy, 93

F.Supp.2d 487, 499 (S.D.N.Y. 2000) (in order to successfully oppose a motion to amend based

on undue delay, the moving party "must make a showing of substantial and undue prejudice

resulting from the delay").

Under Rule 15(a), unfair prejudice exists where the opposing party would

experience undue difficulty in defending a lawsuit because of a change of tactics or theories on

the part of the movant. Henry v. Murphy, No. M–82 (JFK), 2002 WL 24307, at *2 (S.D.N.Y.

Jan. 8, 2002). Amendment may also be unfairly prejudicial where it would "require the

opponent to expend significant additional resources to conduct discovery and prepare for trial" or

"significantly delay the resolution of the dispute." AEP Energy Servs. Gas Holding Co. v. Bank

of Am., N.A., 626 F.3d 699, 725-26 (2d Cir. 2010). Generally "the adverse party's burden of

undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a

pleading[, however]." TIG Ins. Co. v. Century Indem. Co., No. 08 Civ. 7322(JFK)(THK), 2009

WL 959653, at *3 (S.D.N.Y. Apr. 8, 2009) (citing United States v. Continental Ill. Nat'l Bank &

Trust of Chicago, 889 F.2d 1248, 1255 (2d Cir. 1989). "The party opposing the motion for leave

to amend has the burden of establishing that an amendment would be prejudicial." Fariello v. Campbell, 860 F.Supp. 54, 70 (E.D.N.Y. 1994).

## II.   DISCUSSION

ChoicePoint opposes Pasternack's motion for leave to file a second amended complaint on grounds of undue delay and unfair prejudice, and futility.

### A.   Delay and Prejudice

This Court granted ChoicePoint's motion to dismiss on August 1, 2011. (Dkt. No. 22)  Four days later, Pasternack requested leave to file a second amended complaint. (Dkt. No. 24)   He then sought an extension of time in order to obtain new counsel. (Dkt. No. 25) New counsel was retained within a month's time. (Dkt. No. 29)  Pasternack then filed his motion seeking leave to file a second amended complaint in November 2011, within three months of this Court's August 2011 dismissal order. (Dkt. No. 37)  The Court concludes that Pasternack was not dilatory in submitting his request for leave to file a second amended complaint.

ChoicePoint has likewise not demonstrated that it will suffer unfair prejudice if this Court permits further amendment. UMG Recordings, Inc. v. Lindor, No. CV-05-1095(DGT), 2006 WL 3335048, at *3 (E.D.N.Y. Nov. 9, 2006) ("delay alone is not enough to warrant denial of the motion.  Plaintiffs must also show bad faith or prejudice"); Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647, 653 n. 6 (2d Cir. 1987) (mere delay, absent a showing of bad faith or prejudice, is not alone grounds for denial of leave to amend).  The fact that the proposed SAC seeks to address defects noted in this Court's dismissal order provides no basis for denying leave to amend. See Luparello v. Inc. Vill. of Garden City, 290 F.Supp.2d 341, 344 (E.D.N.Y. 2003) ("[T]o the extent that the proposed amendments may be said to cure deficiencies in the complaint, that result is not a basis for their denial."); Vulcan Soc. of

Westchester Co. Inc. v. Fire Dept. of White Plains, 82 F.R.D. 379, 386 (S.D.N.Y. 1979) ("Even to the extent it may be said the amendments seek to cure deficiencies in the original complaint, such is not alone a basis for their denial."). The proposed SAC does not contain any additional or different claims or theories as against ChoicePoint, nor does Pasternack seek to add new parties. To the contrary, the SAC narrows the issues as against ChoicePoint, because the fraud and Section 1983 claims pled against ChoicePoint in the Amended Complaint are dropped in the SAC.

The only prejudice that ChoicePoint cites is that it will be forced to return to a proceeding after the claims against it were dismissed. This is not unfair prejudice, however, if the claims made by Pasternack meet the Iqbal/Twombly standard.

In sum, ChoicePoint has not demonstrated that Pasternack was dilatory in seeking permission to file the proposed SAC or that it will suffer unfair prejudice if the motion to amend is granted.

**B.**     **Futility**

The Amended Complaint alleged causes of action against ChoicePoint for fraud, negligence, gross negligence, and for violations of 42 U.S.C. § 1983. (Am. Cmplt., Tenth, Eleventh, Twelfth, and Thirteenth Causes of Action) In the SAC, Pasternack drops the fraud and Section 1983 claims as to ChoicePoint but re-asserts his claims for negligence and gross negligence.[4] (SAC, Fourth and Fifth Causes of Action)

Pasternack's theory of liability for his negligence claims is that

ChoicePoint breached its duty to Dr. Pasternack by mishandling the review and evaluation of his laboratory results in violation of DOT Regulations.

---

[4] Although Pasternack asserts in his principal brief that the SAC contains a cause of action for negligent misrepresentation against ChoicePoint (Pltf. Br. 1), this is incorrect. The Third Cause of Action for negligent misrepresentation names only LabCorp. (SAC, Third Cause of Action)

Specifically, . . . ChoicePoint, through its employees, failed to investigate the facts of Dr.
Pasternack's collection, as it was required to do under 49 C.F.R. § 40.123(3), or make the
determination that (1) Dr. Pasternack's specimen should be verified as a positive result,
(2) Dr. Pasternack's specimen should be verified as a negative result, (3) Dr. Pasternack's
test should be cancelled, or (4) Dr. Pasternack should be deemed a refusal to test due to
adulteration or substitution of sample. Instead, ChoicePoint determined that Dr.
Pasternack was a refusal to test for other reasons and only belatedly communicated that
determination, without explanation, to Northeastern and the FAA despite the fact that
ChoicePoint was expressly prohibited from making that determination by the clear
language of 49 C.F.R. § 40.355(i).

(SAC ¶¶ 77-78, 83-84) Pasternack also states that he is not claiming that ChoicePoint "merely

misinterpreted a regulation," but instead that ChoicePoint "breached [its] duties to him by failing

to follow the unambiguous mandates of the DOT regulations and guidelines." (Pltf. Br. 10)

In arguing that MRO Samuels violated DOT regulations, Pasternack now cites to

49 C.F.R. § 40.123(e) and 49 C.F.R. § 40.355. 49 C.F.R. § 40.123(e) provides:

**What are the MRO's responsibilities in the DOT drug testing program?**

As an MRO, you have the following basic responsibilities:

. . .

(e) You must act to investigate and correct problems where possible and notify
appropriate parties (e.g., HHS, DOT, employers, service agents) where assistance is
needed, (e.g., cancelled or problematic tests, incorrect results, problems with blind
specimens).

49 C.F.R. § 40.123(e).

49 C.F.R. § 40.355 provides:

**What limitations apply to the activities of service agents?**

. . .

(i) Except as provided in paragraph (j) of this section, you must not make a
determination that an employee has refused a drug or alcohol test. This is a
non-delegable duty of the actual employer. You may, however, provide advice
and information to employers regarding refusal-to-test issues.

(j) As an exception to paragraph (i) of this section, you may make a
determination that an employee has refused a drug or alcohol test, if:

15

> (1) You schedule a required test for an owner-operator or other self-employed individual, and the individual fails to appear for the test without a legitimate reason; or
>
> (2) As an MRO, you determine that an individual has refused to test on the basis of adulteration or substitution.

49 C.F.R. § 40.355(i) and (j) (emphasis added).

### (1)    **Applicable Law**

As noted above, under New York law, "'a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" Farash v. Cont'l Airlines, Inc., 574 F.Supp.2d 356, 367 (S.D.N.Y. 2008) (quoting Alfaro v. Wal–Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000)). To prevail on a gross negligence claim, plaintiff must establish each of these three elements and offer evidence that the defendant's conduct "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." AT & T v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996) (quoting Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd., 81 N.Y.2d 821, 823-24 (1993)). Where a claim for ordinary negligence fails, a gross negligence claim necessarily fails. Farash, 574 F. Supp. 2d at 368.

"The existence of a duty is an essential element of a negligence claim because, '[i]n the absence of a duty, as a matter of law, no liability can ensue.'" Farash, 574 F. Supp. 2d at 367 (quoting McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)). "A plaintiff must show more than a duty owed to a potentially limitless class of people, but rather a specific duty owed to the plaintiff." Gen. Star Indem. Co. v. Platinum Indem. Ltd., No. 00 CIV. 4960 (LMM) (GWG), 2002 WL 31159106, at *3 (S.D.N.Y. Sept. 27, 2002) (citing Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232 (N.Y. 2001) ("injured party must show that a defendant owed not

16

merely a general duty to society but a specific duty to him or her"); Lauer v. City of New York,

95 N.Y.2d 95, 100 (N.Y. 2000) ("[w]ithout a duty running directly to the injured person there

can be no liability in damages, however careless or foreseeable the harm")). As the Second

Circuit has emphasized, "in New York . . . 'the judicial power to modify the general rule' of

ordinary care 'is reserved for very limited situations' and is not to be 'exercise[d]. . . on an ad

hoc basis.'" Alfaro, 210 F.3d at 115 (quoting Stagl v. Delta Airlines, Inc., 52 F.3d 463, 469 (2d

Cir. 1995)).

      "Although juries determine whether and to what extent a particular duty was

breached, it is for the courts first to determine whether any duty exists." Drake III, 2007 WL

776818, at *2 (citing Darby, 96 N.Y.2d at 347 (citations omitted)). See also Palka v.

Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 585 (N.Y. 1994) ("the definition of the

existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration

reserved for judges to make prior to submitting anything to fact-finding or jury consideration"

(citations omitted)). The determination of whether a party breached its duty of care may also be

decided as a matter of law. Blye v. Manhattan & Bronx Surface Transit Operating Auth., 124

A.D.2d 106, 109 (1st Dept. 1987) ("The facts at bar, which are not susceptible to varying

interpretations, enable us to determine, as a matter of law, whether a breach of duty of care has

occurred.") (citing Sheehan v. City of New York, 40 N.Y.2d 496, 502 (N.Y. 1976); Palsgraf v.

Long Island Railroad Company, 248 N.Y. 339, 345 (N.Y. 1928); Amoruso v. New York City

Transit Authority, 12 A.D. 2d 11, 12 (1st Dept. 1960)). A finding of negligence "may be based

only upon the breach of a duty. If . . . the defendant owes no duty to the plaintiff, the action must

fail. Although juries determine whether and to what extent a particular duty was breached, it is

17

for the courts first to determine whether any duty exists." <u>Darby</u>, N.Y.2d at 347 (citations omitted).

2.    **Analysis**

In the August 2011 dismissal order, this Court found that Pasternack had failed to demonstrate that MRO Samuels (1) owed Pasternack a duty of care not to misinterpret DOT regulations relating to a "refusal to test"; and (2) had acted negligently in concluding that, under DOT regulations, Pasternack's departure from the collection site constituted a "refusal to test." <u>Pasternack</u>, 2011 WL 3478732, at *12-13.  In arguing that ChoicePoint owed him a duty of care, Pasternack had relied on <u>Drake III</u>, <u>Santiago</u>, and <u>Coleman</u>, all of which involved "a direct mishandling of plaintiff's urine specimen." 2011 WL 3478732, at *12.  The Court noted that extending a duty of care to include proper interpretation of DOT regulations regarding a 'refusal to test' would represent a significant extension of precedent." (<u>Id.</u>)

While a number of courts have recognized "the existence of a limited duty on the part of [a drug testing] laboratory to employees who are the subject of the tests," <u>Coleman v. Town of Hempstead</u>, 30 F. Supp. 2d 356, 364 (E.D.N.Y. 1999) (citing <u>Cooper v. Laboratory Corp. of America Holdings, Inc.</u>, 150 F.3d 376, 380 (4th Cir. 1998) (citing <u>Stinson v. Physicians Immediate Care, Ltd.</u>, 269 Ill. App. 3d 659, 646 (Ill. App. 1995))); <u>see also</u> <u>Admiral Webster v. Psychemedics Corporation</u>, No. 2010-01087-COA-R3-CV, 2011 Tenn. App. LEXIS 335, at *19 (Tenn. Ct. App. June 24, 2011), ChoicePoint's role here is more attenuated and does not fall within the circumscribed duty that has been found in other cases.

For example, in <u>Santiago</u> the court found that the doctor who collected the plaintiff's urine sample "had a duty to [the Plaintiff] to collect his specimen with due care." 965 F.Supp. at 153.  The court recognized this duty based on policy concerns, including the

18

prevalence of drug tests, the possibility of inaccurate results, and the harm to employees who are victims of false positives, but nothing in <u>Santiago</u> suggests that negligence liability may be predicated on a violation of a DOT regulation regarding the communication of a determination that an employee has engaged in conduct constituting a "refusal to test." <u>See id.</u> at 149-50.

In <u>Coleman</u>, the court likewise found that LabCorp – which had been hired by the town of Hempstead to "interpret the uninalysis test" – owed a duty of care to a tested employee. In that case, Coleman's urine sample was lost and then invalidated because the seal on the specimen had been broken. <u>Coleman</u>, 30 F. Supp. 2d at 359. Coleman alleged that LabCorp's actions in "failing to safeguard plaintiff's . . . urine sample in the chain of custody, and failing to provide the . . . urine sample for retesting," amounted to negligence. <u>Id.</u> at 360. The <u>Coleman</u> court concluded that LabCorp owed a duty to a "victim of a negligently administered urinalysis" test. <u>Id.</u> at 365. Once again, nothing in Coleman suggests that negligence liability can be predicated on a failure to follow a DOT regulation regarding a "refusal to test."

Plaintiff also argues that in <u>Drake III</u>,[5] the court allowed the negligence claim to proceed where "the plaintiff had alleged that the MRO approved an unlawful re-test of a urine sample and 'accepted the false and improper results of the . . . purported re-test and transmitted the results to' the plaintiff's employer." (Pltf. Br. 12) The allegations in <u>Drake</u> went beyond these procedural irregularities, however. Drake also alleged that the MRO "sent an aliquot of

---

[5] In <u>Drake III</u>, the court found that the facts supported a claim of negligence against, <u>inter alia</u>, the MRO, based on <u>Coleman</u> and <u>Santiago</u>, or alternatively, under the first prong of the test in <u>Fernandez v. Otis Elevator Company</u>, 4 A.D.3d 69, 73 (1st Dept. 2004) ("[A] duty of care to non-contracting third parties may arise . . . where the contracting party, in failing to exercise reasonable care in the execution of the contract, creates an unreasonable risk of harm to others, or exacerbates that risk. . . ."). 2007 WL 776818, at *3. Pasternack has not argued on the instant motion that negligence liability is proper under the <u>Fernandez</u> test.

someone else's urine sample to Northwest [Toxicology for testing] . . . claiming that the urine sample was obtained from Drake." Drake III, 2007 WL 776818, at *2.

Likewise in Landon v. Kroll Laboratory Specialists, Inc., 91 A.D.3d 79, 80-81, 85 (2d Dept. 2011) (see Dec. 8, 2011 Arato Ltr.), the defendant laboratory allegedly performed a toxicology test in violation of industry-wide standards and failed to confirm the test, resulting in an erroneous report of drug use.

In short, all of the cases cited by Pasternack involve a mishandling of the plaintiff's urine sample or improper testing, and thus allege underlying conduct presenting classic examples of negligence.[6] This is not that case.

Here, instead, Pasternack argues that his negligence and gross negligence claims should be permitted to proceed solely because Dr. Samuels violated two DOT regulations. The first – 49 C.F.R. § 40.123(e) – directs an MRO "to investigate and correct problems where possible and notify appropriate parties (e.g., HHS, DOT, employers, service agents) where assistance is needed, (e.g., cancelled or problematic tests, incorrect results, problems with blind specimens)." The Court holds, as a matter of law, that any obligation imposed by this regulation is – in the context of this case – too vague to serve as the basis for a negligence action.

The second regulation cited by Pasternack – 49 C.F.R. § 40.355(i) – states that, except as provided in § 40.355(j), an MRO "must not make a determination

---

[6] Warshaw v. Concentra Health Services, 719 F.Supp. 2d 484 (E.D. Pa. 2010), also cited by Plaintiff (Pltf. Br. 10 n.3, 12), is not apposite. As in Landon, Concentra Health – the defendant in Warshaw – was the company that had administered the drug test and analyzed the sample – the equivalent of LabCorp in this case. Warshaw, 719 F.Supp. 2d at 489-90. Warshaw claimed that Concentra had acted negligently in reporting that he had tested positive for methamphetamine, because the positive result was caused by a prescription drug. Id. The court concluded that a triable issue of fact existed as to whether Concentra had breached its duty of care to Warshaw. Id. at 505. Because Warshaw's negligence claim did not rest on the argument that the defendant had violated a regulation, it does not shed light on the issue here.

that an employee has refused a drug or alcohol test.  This is a non-delegable duty of the

actual employer.  You may, however, provide advice and information to employers

regarding refusal-to-test issues."  49 C.F.R. § 40.355(i) (emphasis added).

> §40.355(j) states:

> As an exception to paragraph (i) of this section, you may make a determination
> that an employee has refused a drug or alcohol test, if:

>> (1) You schedule a required test for an owner-operator or other self-
>> employed individual, and the individual fails to appear for the test
>> without a legitimate reason; or

>> (2) As an MRO, you determine that an individual has refused to test
>> on the basis of adulteration or substitution.

49 C.F.R. § 40.355(j).

In the SAC, Pasternack alleges that ChoicePoint violated §40.355(i) by

"transmit[ing] to Northeastern a one-page form that reported that Dr. Pasternack was a 'refusal to

test.'"  (SAC, ¶ 38)  ChoicePoint argues that it did no more than provide advice to Northeastern

about a "refusal to test," which it is explicitly permitted to do under § 40.355(i).  (Def. Br. 11)

The form referenced in the SAC has not been provided to the Court, however, and in the context

of this motion, the Court must assume that it does indeed transmit ChoicePoint's determination

that Pasternack's conduct constitutes a "refusal to test."  Recognizing that the regulation's

authorization to provide advice regarding "refusal to test" issues may provide a safe harbor for

ChoicePoint's communication to Northeastern, the Court will nonetheless assume, for purposes

of the instant motion, that (1) ChoicePoint made a determination that Pasternack had engaged in

a "refusal to test"; (2) ChoicePoint transmitted its determination to Northeastern (and to the

FAA, see SAC, ¶ 40); and (3) ChoicePoint's actions violate the proscription set forth in 49

C.F.R. § 40.355(i).  The question remains whether violation of this regulation, standing alone, may provide the basis for a negligence action under New York law.

Pasternack has cited no case suggesting that a violation of 49 C.F.R. § 40.355(i) provides a basis for a negligence action under New York law.  To the contrary, under New York law, violation of a regulation – as opposed to a statute – is not negligence per se but merely "some evidence" of negligence that a jury may consider in rendering its verdict.  Chen v. United States, 854 F.2d 622, 627 (2d Cir. 1988) ("[I]t is 'long and firmly established in New York that the violation of a rule of an administrative agency' is '"merely some evidence"' of negligence but 'does not establish negligence as a matter of law' because a regulation 'lack[s] the force and effect' of a statute." (quoting Long v. Forest-Fehlhaber, 55 N.Y.2d 154, 134 (1982) (quoting Teller v. Prospect Hgts. Hosp., 280 N.Y. 456, 460 (1939)); see also Cappellini v. McCabe Powers Body Co., 713 F.2d 1, 4 (2d Cir. 1983) ("a regulatory violation does not establish negligence per se , but [merely constitutes] some evidence of negligence, which the jury could take into consideration with all other evidence bearing on the subject"); In re September 11 Property Damage and Business Loss, 468 F.Supp.2d 508, 522 (S.D.N.Y. 2006) (violation of New York City and State fire and safety codes constitutes only evidence of negligence) (citing Elliott v. City of New York, 95 N.Y.2d 730, 734 (2001); Bliss v. State, 686 N.Y.S.2d 556, 560 (N.Y. Ct. Cl., 1998) ("[Defendant driver]'s failure to follow NYSTA's rules and regulations for operating a backup truck is merely some evidence of negligence").  The Court concludes that Pasternack's negligence claims cannot be premised solely on the argument that ChoicePoint

violated a federal regulation in making a determination that Pasternack had engaged in a "refusal to test."[7]

In arguing that ChoicePoint acted negligently in telling Northeastern and the FAA that Pasternack had engaged in a "refusal to test," Pasternack argues both that ChoicePoint violated its obligation – under 49 C.F.R. § 40.355(i) – not to make a "refusal to test" determination, and erroneously interpreted the regulations governing "refusal to test." See, e.g., Pltf. Reply Br. 8 (determination that Pasternack had engaged in a "refusal to test" "was not ChoicePoint's [determination] to make"); SAC, ¶ 45 (referring to ChoicePoint's "erroneous determination" that Pasternack's conduct constituted a "refusal to test"). Assuming arguendo that ChoicePoint's made an "erroneous determination" in deciding that Pasternack's conduct constituted a "refusal to test," no reasonable jury could find that ChoicePoint's determination that Plaintiff had engaged in a "refusal to test" was negligent under 49 C.F.R. §§ 40.191(a)(2) and 40.193. It seems clear from the regulations that Pasternack's conduct does in fact constitute a "refusal to test." For example, 49 C.F.R. § 40.191(a)(2) states that "[a]s an employee, you have refused to take a drug test if you . . . [f]ail to remain at the testing site until the testing process is complete." Similarly, 49 C.F.R. § 40.193 provides that "[i]f the employee . . . leaves the collection site before the collection process is complete. . . . [t]his is a refusal to test."[8] The

---

[7] To permit Pasternack's negligence claims to proceed solely on the basis of ChoicePoint's alleged violation of Section 40.355(i) would, in essence, give test subjects a private right of action for violation of that regulation, cloaked in the form of a state law negligence claim. The Second Circuit has held, however, that "the FAA Act does not provide a private right of action for violations of FAA drug-testing regulations." Drake II, 458 F.3d at 64. Accordingly, Pasternack must identify a basis in New York law for his negligence claims.

[8] Pasternack argues that "DOT Regulations recognize that not all early departures are to be considered refusals to test" (Pltf. Reply Br. 7), citing to 49 CFR §§ 40.199-40.203 and 49 C.F.R. Part 40 App.H. Pasternack does not argue that any of the circumstances described in §§ 40.199-40.203 are applicable here, however. Appendix H to Part 40 likewise does not contradict the clear language of 49 C.F.R. §§ 40.191(a)(2) and 40.193.

Court's interpretation of these provisions is confirmed by the findings of the FAA and an ALJ on review; both concluded that Pasternack's conduct constitutes a "refusal to test" under the applicable regulations.  (Apr. 8, 2011 ALJ Decision at 20–21)

Finally, Pasternack has not offered a plausible theory as to how ChoicePoint caused him injury.  To prevail on his negligence claims, Pasternack must demonstrate that he suffered injury <u>as a result of</u> ChoicePoint's conduct.  <u>Farash</u>, 574 F.Supp. 2d at 367.  The injury to Pasternack – the loss of his airman certificates and AME designation and the resulting loss of compensation – was caused by the legal determination of the FAA and the ALJ that Pasternack's conduct constituted a "refusal to test."  Pasternack's conduct presented a question of law – an issue of regulatory interpretation – that was resolved first by the FAA, and then by an ALJ.  As pled in the Amended Complaint and SAC (see Am. Cmplt. ¶¶ 25-26; SAC ¶¶ 45-46), both the agency and the ALJ concluded that Pasternack's conduct constituted a "refusal to test" under the applicable regulations.  In making that determination, the ALJ conducted a full evidentiary hearing and relied on the evidence offered at that hearing to conclude that Pasternack "refused to take a DOT drug test under the provisions of 49 C.F.R. § 40.191(a)(2) on June 5, 2007."  (Apr. 8, 2011 ALJ Decision at 20)

Because the SAC does not "'state a claim to relief that is plausible on its face,'" <u>Iqbal</u>, 129 S.Ct. at 1960 (quoting <u>Twombly</u>, 550 U.S. at 570), the motion for leave to file a Second Amended Complaint as to ChoicePoint will be denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for leave to file a Second

Amended Complaint is granted as to LabCorp but denied as to ChoicePoint.  The Clerk of the

Court is directed to terminate the motion (Dkt. No. 22).  Pasternack will file a Second Amended

Complaint reflecting the conclusions of this memorandum opinion and order by September 12,

2012.

Dated: New York, New York
      September 5, 2012          SO ORDERED.

                                Paul G. Gardephe
                                United States District Judge