UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: _9/29/14_            │
└─────────────────────────────────┘
```

DR. FRED L. PASTERNACK,

                    Plaintiff,

      v.

LABORATORY CORPORATION OF
AMERICA a/k/a LABCORP and CHOICEPOINT,
INC.,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 4426 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Fred Pasternack commenced this action against Laboratory Corporation

of America ("LabCorp") and ChoicePoint, Inc. on June 3, 2010 (Dkt. No. 1), and filed an

Amended Complaint on August 13, 2010. (Dkt. No. 10)  Pasternack seeks to recover damages

arising from Defendants' alleged misconduct in performing and evaluating a random drug test

that he was required to take as a pilot.

        On August 1, 2011, this Court granted ChoicePoint's motion to dismiss all claims

against it in the Amended Complaint. See Pasternack v. Lab. Corp. of Am., No. 10 Civ. 4426

(PGG), 2011 WL 3478732 (S.D.N.Y. Aug. 1, 2011) ("Pasternack I").

        On September 6, 2012, the Court granted Pasternack's motion for leave to file a

Second Amended Complaint as to LabCorp – which did not oppose the motion – but denied

Pasternack's motion as to ChoicePoint, concluding that amendment as to ChoicePoint would be

futile.  See Pasternack v. Lab. Corp. of Am., 892 F. Supp. 2d 540 (S.D.N.Y. 2012) ("Pasternack

II").

        On September 12, 2012, Pasternack filed the Seconded Amended Complaint

("SAC"), asserting claims for negligence, gross negligence, negligent misrepresentation, fraud,

and injurious falsehood against LabCorp. (Dkt. No. 47) On April 30, 2013, LabCorp moved to dismiss the SAC. (Dkt. No. 56) Pasternack opposes the motion, and has also moved for reconsideration of this Court's August 1, 2011 and September 6, 2012 decisions regarding his claims against ChoicePoint. (Dkt. Nos. 59, 62)

For the reasons stated below, Pasternack's motion for reconsideration will be denied, and LabCorp's motion to dismiss the SAC will be granted.

## BACKGROUND[1]

### I.   FEDERAL LAW GOVERNING THE DRUG TESTING OF AVIATION EMPLOYEES

Because the regulatory scheme governing the testing of aviation employees is critical to an understanding of Pasternack's claims, the Court includes a summary of that scheme and certain relevant regulations.

The Federal Aviation Administration ("FAA") and the U.S. Department of Transportation ("DOT") have issued regulations concerning the drug testing of aviation employees. The Second Circuit outlined the regulatory scheme in Drake v. Laboratory Corporation of America Holdings, 458 F.3d 48 (2d Cir. 2006):

> In the FAAct, Congress granted the FAA broad authority over aviation safety, including the power to adopt regulations that it "finds necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a)(5). Pursuant to this power, in 1988, the FAA promulgated regulations mandating that all aviation-industry employees who perform safety-sensitive functions be subjected to random drug-testing. See Anti-Drug Program for Personnel Engaged in Specified Aviation Activities, 53 Fed. Reg. 47024 (Nov. 21, 1988) (codified as amended at 14 C.F.R. pt. 121, App. I). The regulations set forth in great detail the "standards and components" that required drug-testing programs must include. See 14 C.F.R. pt. 121, App. I. They prescribe, among other things, the classes of employees that must be tested, 14 C.F.R. pt. 121, App. I § III, the substances for which they must be tested, id. § IV, the types of testing to be conducted (e.g., pre-employment testing, random testing, and post-accident testing), id. § V, and the length of time that records of required drug testing must be retained, id. § VI.

---

[1] Familiarity with this Court's prior orders is presumed.

The FAA regulations incorporate by reference DOT regulations that set out detailed protocols to be followed by drug-testing laboratories. See id. § I.B. (requiring that aviation employers comply with "Procedures for Transportation Workplace Drug Testing Programs," 49 C.F.R. pt. 40, published by the DOT). The DOT regulations provide, among other things, that laboratories must use chain-of-custody procedures to document each time a urine specimen is handled or transferred, see 49 C.F.R. § 40.83(b), that an employer's designated MRO [Medical Review Officer] must review and certify test results before the laboratory reports them to the employer, id. § 40.97(b); id. § 40.123, and that laboratories must report test results to an MRO in writing, id. § 40.97(b). Although they set out elaborate rules for conducting drug tests, the DOT regulations do not specifically address negligence on the part of drug-testing laboratories or otherwise establish the minimum standard of care to be exercised by laboratory personnel.

Id. at 56-57.

The dispute between the parties in this action concerns the consequences of Pasternack's initial failure to provide an adequate urine sample when randomly chosen for a drug test, and his decision to leave the collection facility before the collection process was complete. Two DOT regulations provide that where an employee leaves a collection site before the collection process is complete, that conduct constitutes a "refusal to test":

**40.193 What happens when an employee does not provide a sufficient amount of urine for a drug test?**

(a) This section prescribes procedures for situations in which an employee does not provide a sufficient amount of urine to permit a drug test (i.e., 45 mL of urine).

(b) As the collector, you must do the following:

(1) Discard the insufficient specimen, except where the insufficient specimen was out of temperature range or showed evidence of adulteration or tampering (see § 40.65(b) and (c)).

(2) Urge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a sufficient urine specimen, whichever occurs first. It is not a refusal to test if the employee declines to drink. Document on the Remarks line of the CCF [Custody and Control Form] (Step 2), and inform the employee of, the time at which the three-hour period begins and ends.

3

(3) If the employee refuses to make the attempt to provide a new urine specimen or <u>leaves the collection site before the collection process is complete</u>, you must discontinue the collection, note the fact on the "Remarks" line of the CCF (Step 2), and immediately notify the DER [Designated Employer Representative]. This is a refusal to test.

49 C.F.R. § 40.193 (emphasis added).

> **40.191 What is a refusal to take a DOT drug test, and what are the consequences?**
>
> (a) As an employee, you have refused to take a drug test if you:
>
> . . .
>
> (2) Fail to remain at the testing site until the testing process is complete . . .

<u>Id.</u> § 40.191(a)(2).

In addition to these regulations, the DOT has disseminated <u>DOT Urine Specimen Collection Guidelines</u> that contain "shy bladder" procedures, which apply in "a situation when the employee does not provide a sufficient amount of urine (45 mL) for a DOT-required drug test." Department of Transportation, <u>Urine Specimen Collection Guidelines</u> § 7 (Dec. 2006). The Guidelines state that – in the event an employee provides an "initial insufficient specimen" – the collector should discard the sample and begin the "shy bladder" collection process, <u>id.</u> § 7(2), using the following procedures:

> 3. The collector explains to the employee the process for a shy bladder collection and urges the employee to drink up to 40 ounces of fluids, distributed reasonably through a period of up to three hours, or until the individual has provided a sufficient urine specimen, whichever occurs first. It is <u>not a refusal</u> to test if the employee <u>declines</u> to drink.
>
> . . .
>
> 4. If the employee refuses to make the attempt to provide a new urine specimen or leaves the collection site before the collection process is completed, the collector must discontinue the collection, note the fact on the "Remarks" line of the [Federal Drug Testing Custody and Control Forms ("CCF")] . . . , and

immediately notify the [Designated Employee Representative ("DER")].  This is a refusal to test.

5.  If the employee has not provided a sufficient specimen within three hours of the first unsuccessful attempt to provide the specimen, the collector must discontinue the collection, note the fact on the "Remarks" line of the CCF (Step 2), and immediately notify the DER.

> Note:  The collector should maintain a record in the "Remarks" line on the CCF of the time of each attempt, whether there was any specimen provided or the quantity of specimen provided, and the amount of fluids that the employee was given to drink.  During the waiting time, the employee must be monitored by the collector (the one conducting the collection or another collector at the site) or by another responsible collection site staff member or a company representative.  The collector must specifically tell the employee that he or she is not permitted to leave the collection site and if they do so, that it will be considered a refusal to test.

6. The collector then sends Copy 2 of the CCF to the MRO and Copy 4 to the DER.  This is done even if the employee did not provide any specimen in order to notify the MRO and the employer of the problem.  The collector must send or fax these copies to the MRO and DER within 24 hours or the next business day.

Id. § 7(3)-(6).

The Guidelines state that "[t]he information in this document addresses normal collection procedures and some of the more common problems or situations encountered.  However, information contained in this publication should not be used to interpret the legal requirements of the actual rule."  Id. at 3 ("Introduction") (emphasis added); see also Fred Leroy Pasternack, NTSB Order No. EA-5615, 2012 WL 562137, at *8 (Feb. 13, 2012) (the "DOT [Urine Specimen] Collection Guidelines are just that – guidelines, and not regulations.  Thus, they do not carry with them the force of a regulation to make them binding on the collector.").

5

## II.   PASTERNACK'S DRUG TEST[2]

Pasternack is a physician and part-time commercial pilot, and from 1978 to February 2008, he was a Senior Aviation Medical Examiner ("AME") for the FAA. (SAC (Dkt. No. 47) ¶¶ 3, 9) As an AME, Pasternack performed medical examinations that the FAA requires pilots to undergo in order to maintain certain certifications. (Id.) He also piloted chartered flights for Northeastern Aviation Corporation ("Northeastern"). (Id. ¶ 10) Pasternack received compensation both as an AME and as a Northeastern pilot. (See id. ¶¶ 9-10)

Defendant ChoicePoint – a laboratory that performs drug testing – entered into a contract with Northeastern in which it agreed to "help administer Northeastern's drug testing program." (Id. ¶ 14) Defendant LabCorp – which provides, among other services, "specimen collection and laboratory drug testing services to private entities" (id. ¶ 4) – entered into a contract with ChoicePoint in which it agreed to "perform specimen collection and testing services, which included specimen collection and testing services for Northeastern." (Id. ¶ 15) Under that contract, "LabCorp was required to comply with the DOT Regulations and the DOT's Urine Specimen Collection Guidelines ('DOT Guidelines' [or the 'Guidelines']) as they pertain to collectors and laboratories." (Id.; see Department of Transportation, Urine Specimen Collection Guidelines at 2 (Dec. 2006) ("These guidelines apply . . . to . . . those individuals who conduct urine specimen collections under DOT regulations."))

On June 1, 2007, Northeastern notified Pasternack that he had been selected for random drug testing. (Id. ¶ 16) On June 5, 2007, at about 1:10 p.m., Pasternack appeared for

---

[2] The following facts are drawn from the SAC and are presumed true for purposes of resolving LabCorp's motion to dismiss. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). "[T]he court need not accept [ – and has not accepted – ] as true 'conclusions of law or unwarranted deductions of fact,'" however. Whitfield v. O'Connell, No. 09 Civ. 1925 (WHP), 2010 WL 1010060, at *4 (S.D.N.Y. Mar. 18, 2010) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994)).

drug testing at a LabCorp collection site located at 1317 Third Avenue in Manhattan.  (Id. ¶ 17)

Pasternack brought to the site a pre-printed chain-of-custody form (the "CCF") that Northeastern

had given to him, as DOT regulations require.  (Id.)

At the collection site, Pasternack attempted to provide a urine sample, but was

unable to produce "a sufficient amount of urine" – the "shy bladder" scenario.  (Id. ¶ 18)

Theresa Montalvo, a Patient Service Technician for LabCorp (Steiner Decl. (Dkt. No. 57), Ex. 4

at 3), told Pasternack that his sample was not adequate and that he would need to produce

another one (id. at 13), but did not explain the shy bladder procedures to him nor urge him to

drink additional fluids.  (SAC, ¶¶ 18, 20)  Instead, she simply instructed Pasternack to return to

the waiting room.  (Id. ¶ 20)

Pasternack went to the waiting room but "believed that he was unlikely to

produce a sufficient urine sample before needing to depart for his office" for a scheduled

aviation medical examination he was administering.  (Id. ¶ 21; Steiner Decl. (Dkt. No. 57) Ex. 4

at 8)  Pasternack told Montalvo that he needed to leave the collection site, but would return later

to provide the sample.  (Id. ¶ 22)  Montalvo did not inform Pasternack that leaving the collection

site at that point would be considered a "refusal to test."  (Id. ¶¶ 19-20, 22)   Montalvo did tell

Pasternack that she was required to notify Northeastern that he was leaving the collection site,

and she asked when he would return.  (Id.)  Pasternack told Montalvo that she was free to contact

Northeastern and that he would return the next morning.  (Id.)  Pasternack then left the collection

site.  (See id. ¶ 25)

In the SAC, Pasternack pleads that – despite his 30-year experience as a Senior

Aviation Medical Examiner for the FAA (id. ¶ 9) – he "did not know that leaving the collection

site after failing to provide a sufficient sample could constitute a refusal to test," and that had he

known of "the consequences of departing the facility, [he] would not have left . . . until he either had provided a sufficient urine sample or had otherwise complied with the shy bladder procedures."[3]  (Id. ¶ 24)

Shortly after 4:00 p.m. that same day – after administering the aviation medical examination – Pasternack returned to the LabCorp facility.  (Id. ¶ 26; Steiner Decl. (Dkt. No. 57) Ex. 4 at 10)  Montalvo then called Northeastern and obtained permission to take a second urine sample from Pasternack, "notwithstanding that Dr. Pasternack had previously left the collection site that day."  (Id. ¶ 26)  Montalvo noted on the CCF that "Pasternack had left and returned" and that "Northeastern [had] approved the second collection."  (Id.)  Montalvo proceeded with the second collection, using the same CCF that had been initiated earlier that morning during Pasternack's first visit.  (Id. ¶ 28)  Pasternack provided an adequate urine sample, and LabCorp's subsequent analysis indicated that the sample tested negative for prohibited drugs.  (Id. ¶¶ 27, 29)  LabCorp sent the lab results, along with the CCF, to ChoicePoint for verification.  (Id.)  Montalvo also provided copies of the CCF to Pasternack for him and his employer.  (Id. ¶ 28)

ChoicePoint determined that Pasternack had left the collection site before the test was completed, and that this conduct constituted a "refusal to test."  (Id. ¶ 30)  Pasternack asserts that "ChoicePoint made this determination based on the isolated portion of Ms. Montalvo's notation on the CCF that Dr. Pasternack had left and returned."  (Id.)  ChoicePoint reported to the FAA that there had been a "refusal to test."  (Id. ¶ 31)

On July 17, 2007, two FAA investigators interviewed Montalvo regarding the

_____

[3]  In addition to serving as a Senior Aviation Medical Examiner for 30 years, Pasternack served as a Medical Review Officer from 1990 to 2006, and was thus himself responsible for reviewing and certifying drug test results pursuant to the applicable DOT regulations.  (Steiner Decl. (Dkt. No. 57) Ex. 4 at 10)  Moreover, before the ALJ, an FAA investigator testified that Pasternack had received training from Northeastern that alerted him to the fact that leaving a test site prior to completing a drug test constituted a "refusal to test."  (Steiner Decl. (Dkt. No. 57), Ex. 4 at 7)

circumstances surrounding the collection of Pasternack's urine specimen on June 5, 2007.  (Id. ¶ 32)  During the interview, and in her subsequent signed statement, Montalvo did not tell the investigators that "Pasternack had told her during the initial collection that he planned to return to complete his collection."  (Id. ¶ 35)

In a November 20, 2007 Emergency Order, the FAA revoked all of Pasternack's airman certificates, finding that he had engaged in a "refusal to test."  (Id. ¶ 36)  On February 21, 2008, the FAA terminated Pasternack's AME designation, citing his "refusal to submit to a random drug test."  (Id.)  As a result, Dr. Pasternack was "unable to pilot any flights or perform pilot medical examinations or function as an AME."  (Id.)

Pasternack claims that – because of LabCorp's actions – he "has lost, and continues to lose, income that he would have earned by continuing to pilot aircraft," and has lost "a major portion of his income as a physician, including [compensation he would have received for] administration of FAA medical examinations and consultations as an AME."  (Id. ¶ 39)

## III.   PASTERNACK'S CHALLENGE TO THE FAA'S ACTION

Pasternack challenged the FAA's revocation of his airman certificates.  After a hearing, an administrative law judge ("ALJ") upheld the revocation, as did the National Transportation Safety Board ("NTSB").  (Id. ¶ 37; Steiner Decl. (Dkt. No. 57), Exs. 1, 2) The NTSB noted that Pasternack's undisputed conduct fell within the plain language of the 49 C.F.R. § 40.191(a)(2)'s definition of a "refusal to test."  (Steiner Decl. (Dkt. No. 57), Ex. 2 at 11)  The Board then considered Pasternack's "exculpatory justification" for his refusal to test, which was that he was not told the consequences of leaving the facility prior to completing the drug test.  (Id. at 12-13)  Pasternack had testified that he left with the collection site with Montalvo's acquiescence, while Montalvo testified that Pasternack "rushed out of the facility"

9

while she was attempting to explain the shy bladder procedures to him. (See id. at 6-7)  The

Board concluded that the ALJ had made an "implicit[ ] credibility determination" against

Pasternack, and that the evidence demonstrated that Pasternack's own behavior had precluded

Montalvo from explaining the shy bladder procedures to him. (Id. at 12)

Pasternack then appealed to the United States Court of Appeals for the District of

Columbia.  The D.C. Circuit found that the NTSB's determination that Montalvo had been

"precluded" from explaining the shy bladder procedures to Pasternack was not supported by

substantial evidence, and therefore vacated the decision and remanded to the NTSB. Pasternack

v. Nat'l Transp. Safety Bd., 596 F.3d 836, 837-38 (D.C. Cir. 2010).  In doing so, the court noted

that "it may be that 49 C.F.R. § 40.191(a)(2) is a strict liability provision," but that "the Board

having entertained Pasternack's 'exculpatory justification,' and having rejected it on a ground

not supported by substantial evidence, we are constrained to vacate the Board's decision." Id. at

839.

On September 2, 2010, the NTSB remanded the case to the ALJ, directing, inter

alia, that the ALJ make the necessary credibility findings concerning the interaction between

Pasternack and Montalvo at the collection site.  (Steiner Decl. (Dkt. No. 57), Ex. 3)  In an April

8, 2011 decision, the ALJ concluded that

    (1)    Montalvo had in fact told Pasternack to drink water so that he could produce an adequate specimen, but that Pasternack left the collection site "hurriedly," no more than 10 minutes after he began the testing process (id., Ex. 4 at 14-15);

    (2)    Pasternack had left in such a rush that Montalvo did not have sufficient time to explain the "shy bladder" procedures to him and the consequences of leaving the collection site without completing the drug test (id. at 15, 20);

    (3)    given Pasternack's work experience – including as an MRO – and training, he "knew or should have known that leaving the site of a drug test without providing an adequate urine specimen would constitute a refusal [to test]" (id. at 15 n.6, 20);

10

(4)     Montalvo did not consent to or "signal[] her approval" of Pasternack's departure in any way, and that her warning to Pasternack that she would call his employer about his departure would have led a reasonable person to inquire why, if "he or she was doing nothing improper . . . that was necessary" (id. at 15, 15 n.7; see id. at 16, 20); and

(5)     that Pasternack – as a witness – was "evasive . . . inconsistent and not credible," and had sought to conceal his prior work experience as an MRO, and that Ms. Montalvo and Ms. Santana [another LabCorp witness] were "more credible witnesses than [Pasternack] as to the events that took place at LabCorp's testing facility on June 5, 2007" (id. at 16-17).

The ALJ went on to conclude that Pasternack had thus engaged in a "refusal to test" on June 5, 2007, within the meaning of 49 C.F.R. § 40.191(a)(2), and affirmed the FAA's revocation of Pasternack's airman certificates. (Id. at 21)

The NTSB affirmed the ALJ's April 8, 2011 decision in all respects and denied Plaintiff's petition for review on February 13, 2012. Pasternack, N.T.S.B. Order No. EA-5615, 2012 WL 562137, at *10 (Feb. 13, 2012). In a March 22, 2013 summary order, however, the D.C. Circuit reversed, finding – despite the ALJ's credibility determinations and findings concerning Pasternack's knowledge of the DOT regulations concerning a "refusal to test" – that "the Board's conclusion[ ] that Dr. Pasternack lacked permission to leave the testing facility and, thus, 'refused' a mandatory drug test, fail[ed] for lack of substantial evidence. . . . [C]onsidering the entire record, substantial evidence does not support the NTSB's determination that the collector did not impliedly give Dr. Pasternack permission to leave." (Steiner Decl. (Dkt. No. 57), Ex. 5 at 2)

## IV.     THIS COURT'S PRIOR ORDERS REGARDING CHOICEPOINT

On September 10, 2010, ChoicePoint moved to dismiss the First Amended Complaint ("FAC"), which asserted claims against ChoicePoint for negligence, gross negligence, fraud, and – pursuant to 42 U.S.C. § 1983 – violation of his rights under the Fourteenth Amendment. (Dkt. No. 16) Pasternack claimed that ChoicePoint's MRO – Dr. Melvin Samuels

11

– had wrongfully determined that his leaving the testing site constituted a "refusal to test" and communicated that determination to Northeastern. (Am. Cmplt. (Dkt. No. 10) ¶¶ 22-24)

On August 1, 2011, this Court granted ChoicePoint's motion to dismiss. See Pasternack I, 2011 WL 3478732, at *15. With respect to the negligence claims, the Court concluded that Pasternack had not sufficiently alleged that ChoicePoint owed him a duty of care. Id. at *11-12. Pasternack had "not allege[d] [in the FAC] that ChoicePoint had a contractual relationship with Pasternack's employer." Id. at *12. Moreover, even "[a]ssuming arguendo that Pasternack could plead facts demonstrating that . . . there was a contractual relationship between ChoicePoint and Northeastern, a finding that Dr. Samuels – ChoicePoint's MRO – had a duty of care to Pasternack arising out of his obligation to properly interpret the DOT regulation regarding a 'refusal to test' would represent a significant extension of precedent." Id. The Court also found that Pasternack had not "articulate[d] a plausible theory as to how ChoicePoint misinterpreted the 'refusal to test' regulation" or how Samuels was negligent in determining that Pasternack had engaged in a "refusal to test." Id. at *12-13.

Pasternack subsequently moved for leave to file a Second Amended Complaint. (Dkt. No. 37) Only ChoicePoint opposed the motion. (Dkt. No. 40) As to ChoicePoint, Pasternack's proposed SAC attempted "to address the deficiencies that led to the dismissal of his negligence and gross negligence claims in the August 1, 2011 [o]pinion." Pasternack II, 892 F. Supp. 2d at 542. "Pasternack argue[d] that his negligence and gross negligence claims should be permitted to proceed solely because Dr. Samuels violated two DOT regulations." Id. at 554.

In a September 6, 2012 order, the Court denied Pasternack's motion for leave to amend as to ChoicePoint, concluding that amendment would be futile. Id. at 556-57. The first regulation on which Pasternack premised ChoicePoint's liability – 49 C.F.R. § 40.123(e) –

12

directs an MRO "to investigate and correct problems where possible and [to] notify appropriate parties (e.g., HHS, DOT, employers, service agents) where assistance is needed, (e.g., cancelled or problematic tests, incorrect results, problems with blind specimens)." 49 C.F.R. § 40.123(e). The Court concluded that "as a matter of law . . . any obligation imposed by this regulation [was] – in the context of this case – too vague to serve as the basis for a negligence action." Pasternack II, 892 F. Supp. 2d at 554.

The second regulation Pasternack cited – 49 C.F.R. § 40.355(i) – states that, except as provided in Section 40.355(j), an MRO "must not make a determination that an employee has refused a drug or alcohol test. This is a non-delegable duty of the actual employer. You may, however, provide advice and information to employers regarding refusal-to-test issues." 49 C.F.R. § 40.355(i). Pasternack alleged that ChoicePoint violated this regulation by "transmit[ing] to Northeastern a one-page form that reported that Dr. Pasternack was a 'refusal to test.'" Pasternack II, 892 F. Supp. 2d at 555 (internal quotation marks omitted).

This Court also rejected this argument. The Court distinguished the facts of this case from those in which "courts . . . recognized 'the existence of a limited duty on the part of [a drug testing] laboratory to employees who are the subject of the tests,'" finding that "all of the cases cited by Pasternack involve[d] a mishandling of the plaintiff's urine sample or improper testing, and thus allege[d] underlying conduct presenting classic examples of negligence." Id. at 553-54. However, "ChoicePoint's role here [was] more attenuated and [did] not fall within the circumscribed duty that has been found in other cases." Id. at 553.

The Court further concluded that "Pasternack's negligence claims [could not] be premised solely on the argument that ChoicePoint violated a federal regulation in making a determination that Pasternack had engaged in a 'refusal to test.'" Id. at 555. "[U]nder New York

law, a violation of a regulation – as opposed to a statute – is not negligence per se but merely 'some evidence' of negligence that a jury may consider in rendering its verdict." Id. (citing Chen v. United States, 854 F.2d 622, 627 (2d Cir. 1988) ("[I]t is 'long and firmly established in New York that the violation of a rule of an administrative agency' is '"merely some evidence"' of negligence but 'does not establish negligence as a matter of law' because a regulation 'lack[s] the force and effect' of a statute." (quoting Long v. Forest-Fehlhaber, 55 N.Y.2d 154, 160 (1982) (quoting Teller v. Prospect Hgts. Hosp., 280 N.Y. 456, 460 (1939)))); Cappellini v. McCabe Powers Body Co., 713 F.2d 1, 4 (2d Cir. 1983) ("[A] regulatory violation does 'not establish negligence per se, but [merely constitutes] some evidence of negligence, which the jury could take into consideration with all other evidence bearing on the subject'" (quoting Schumer v. Caplin, 241 N.Y. 346, 351 (1925))))).  The Court also noted that

> [t]o permit Pasternack's negligence claims to proceed solely on the basis of ChoicePoint's alleged violation of Section 40.355(i) would, in essence, give test subjects a private right of action for violation of that regulation, cloaked in the form of a state law negligence claim.  The Second Circuit has ruled, however, that "the FAA Act does not provide a private right of action for violations of FAA drug-testing regulations." Drake II, 458 F.3d at 64.  Accordingly, Pasternack must identify a basis in New York law for his negligence claims.

Id. at 555 n.7.  Because Pasternack had not done so, this Court denied his motion for leave to file a SAC as to ChoicePoint. Id. at 556-57.

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Motion To Dismiss

LabCorp has moved to dismiss the SAC.  (Dkt. No. 56)  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

14

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

In determining the sufficiency of a complaint, this Court may consider "the factual allegations in [the] . . . complaint, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, … [and] documents either in plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (documents that are "integral" to the complaint may be considered on motion to dismiss).

### B.   Motion For Reconsideration

Pasternack has moved for reconsideration of this Court's August 1, 2011 order granting ChoicePoint's motion to dismiss, and its September 6, 2012 order denying Pasternack leave to file a Second Amended Complaint as to ChoicePoint. (Dkt. No. 62) "Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court." Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265

15

(S.D.N.Y. 2012). "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citations and quotation marks omitted)). "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." Davidson v. Scully, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

"The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790). "To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." RST (2005) Inc., 597 F. Supp. 2d at 365 (citing Shrader, 70 F.3d at 257).

"[Local] Rule 6.3 is intended to '"ensure the finality of decisions and to prevent the practice of a losing party . . . plugging the gaps of a lost motion with additional matters."'" Id. (quoting S.E.C. v. Ashbury Capital Partners, L.P., No. 00 Civ. 7898 (RCC), 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988))) (second alteration in original). "A court must narrowly construe and

strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment." Id.

## II.   NEGLIGENCE CLAIMS: DEFENDANTS' DUTY OF CARE TO PASTERNACK

Pasternack has moved for reconsideration of this Court's decisions dismissing his negligence claims against ChoicePoint and denying him leave to amend those claims, based on its conclusion that ChoicePoint did not owe him a duty of care to properly interpret and apply DOT regulations and guidelines. (Dkt. No. 62)

LabCorp has moved to dismiss Pasternack's negligence and gross negligence claims, which Pasternack contends are based on the theory that "LabCorp breached its duty to [him] by mishandling the collection of his urine specimen and the administration of that collection by failing to comply with the DOT Regulations and the DOT Guidelines." (Dkt. No. 56; SAC (Dkt. No. 47) ¶¶ 45, 52) LabCorp has also moved to dismiss Pasternack's negligent misrepresentation claim, in which he alleges that "LabCorp breached its duty to [him] by failing to disclose to [him] information that the DOT Regulations and the DOT Guidelines required it to disclose."[4] (SAC (Dkt. No. 47) ¶ 59) LabCorp argues that these claims must be dismissed because, inter alia, LabCorp did not owe Pasternack a duty of care under New York law to comply with DOT regulations and guidelines. (Def. Motion to Dismiss ("MTD") Br. (Dkt. No.

---

[4] The DOT Regulations do not, in fact, require a site collector to explain the "shy bladder" procedures, to tell a test subject who has appeared for a drug test to remain at the collection site until testing is complete, or to inform test subjects that leaving the collection site constitutes a "refusal to test." See 49 C.F.R. § 40.193. Although the Guidelines recommend that this information be provided to a test subject, the Guidelines do not have the force of law and "should not be used to interpret the legal requirements of the actual [regulations]." Department of Transportation, Urine Specimen Collection Guidelines at 3 (Dec. 2006); see also Fred Leroy Pasternack, 2012 WL 562137, at *8.

17

58) at 14-18, 21-24)

   Because LabCorp's motion to dismiss Pasternack's negligence claims and

Pasternack's motion for reconsideration turn on the same legal issue – whether the DOT

regulations and guidelines at issue here give rise to a duty of care that specimen collectors and

laboratories owe to test subjects – the motions will be considered together.

### A.   Negligence under New York Law

   "Under New York law, which applies to this case, 'a plaintiff must establish three

elements to prevail on a negligence claim:  (1) the existence of a duty on defendant's part as to

plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"  Farash v.

Cont'l Airlines, Inc., 574 F. Supp. 2d 356, 367 (S.D.N.Y. 2008) (quoting Alfaro v. Wal-Mart

Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000)).

   "The existence of a duty is an essential element of a negligence claim because,

'[i]n the absence of a duty, as a matter of law, no liability can ensue.'"  Farash, 574 F. Supp. 2d

at 367 (quoting McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)).  "A plaintiff must

show more than a duty owed to a potentially limitless class of people, but rather a specific duty

owed to the plaintiff."  Gen. Star Indem. Co. v. Platinum Indem. Ltd., No. 00 Civ. 4960 (LMM)

(GWG), 2002 WL 31159106, at *3 (S.D.N.Y. Sept. 27, 2002) (citing Hamilton v. Beretta U.S.A.

Corp., 96 N.Y.2d 222, 232 (2001) ("injured party must show that a defendant owed not merely a

general duty to society but a specific duty to him or her"); Lauer v. City of New York, 95 N.Y.2d

95, 100 (2000) ("[w]ithout a duty running directly to the injured person there can be no liability

in damages, however careless or foreseeable the harm")).  As the Second Circuit has

emphasized, "in New York . . . 'the judicial power to modify the general rule' of ordinary care

'is reserved for very limited situations' and is not to be 'exercise[d]. . . on an ad hoc basis.'"

Alfaro, 210 F.3d at 115 (quoting Stagl v. Delta Airlines, Inc., 52 F.3d 463, 469 (2d Cir. 1995)).

The scope of the duty owed to a plaintiff is a question of law.  See Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 585 (1994) ("[T]he definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for judges to make prior to submitting anything to fact-finding or jury consideration.") (citations omitted).  Where there are no material issues of fact relevant to the breach issue – i.e., where the facts are not susceptible to different inferences – the determination of whether a party breached its duty of care may also be decided as a matter of law.  See Alfaro, 210 F.3d at 116-17 ("[W]e hold that Wal-Mart's alleged breach – failing to assist Alfaro in a timely manner – was outside the scope of its duty to Alfaro."); see also Blye v. Manhattan & Bronx Surface Transit Operating Auth., 124 A.D.2d 106, 109 (1st Dep't. 1987) ("Whether or not in a given case a breach of duty has occurred will depend on the particular facts of the case and is either a question of law or of fact depending on the susceptibility of the facts to varying inferences.  The facts at bar, which are not susceptible to varying interpretations, enable us to determine, as a matter of law, whether a breach of duty of care has occurred.") (citing Sheehan v. City of New York, 40 N.Y.2d 496, 502 (1976); Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 345 (1928); Amoruso v. N.Y.C. Transit Auth., 12 A.D.2d 11, 12 (1st Dep't 1960)).

## B.   **Pasternack's Motion for Reconsideration**

Pasternack asks this Court to reconsider its determination that ChoicePoint did not owe him a duty of care to properly apply DOT regulations and guidelines in light of the New York Court of Appeals' decision in Landon v. Kroll Lab. Specialists, Inc., 22 N.Y.3d 1 (N.Y. 2013).  (Pltf. Motion for Reconsideration Br. (Dkt. No. 63) at 8-12)  In Landon – a negligence action brought by a probationer against a drug testing laboratory – the Court of Appeals affirmed the Appellate Division's denial of defendant's motion to dismiss.  Landon, 22 N.Y.3d at 5, 8.  The Court of Appeals held that plaintiff had sufficiently alleged that the defendant laboratory

19

"did not exercise reasonable care in the testing of plaintiff's biological sample when it failed to adhere to professionally accepted testing standards and, consequently, released a[n erroneous] report finding that plaintiff had tested positive for THC." Id. at 6. The court concluded that the laboratory "had a duty to the test subject to perform his drug test in keeping with relevant professional standards . . ." Id. at 6-7. The absence of a contractual relationship between plaintiff and the laboratory that performed the test was not fatal to his claim because "a duty may arise 'where the contracting party, in failing to exercise reasonable care in the performance of [its] duties, launche[s] a force or instrument of harm.'" Id. at 6 (quoting Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 140 (2002)) (alterations in original). The court found that "[t]he alleged harm to plaintiff was not remote or attenuated. Indeed, it was his own biological specimen that was the sole subject of this testing and he was directly harmed by the positive test result causing the extension of his probation and the necessity of having to defend himself in the attendant court proceedings." Id. at 6. The court also noted the "strong policy-based considerations that counsel[ed] in favor of finding that [the laboratory] owed a duty to plaintiff," including the "profound, potentially life-altering, consequences [for the probationer, such as] . . . the loss of freedom associated with serving an extended period of probation." Id.

In moving for leave to amend the First Amended Complaint, Pasternack cited the Second Department's decision in Landon v. Kroll Lab. Specialists, Inc., 91 A.D.3d 79 (2d Dep't 2011), which was affirmed in 22 N.Y.3d 1 (N.Y. 2013). This Court discussed Landon – and distinguished it – in concluding that ChoicePoint did not owe a duty of care to Pasternack to properly interpret and apply DOT regulations and guidelines. See Pasternack II, 892 F. Supp. 2d at 554 ("[I]n [Landon], the defendant laboratory allegedly performed a toxicology test in violation of industry-wide standards and failed to confirm the test, resulting in an erroneous

report of dr[u]g use."). The Court found that <u>Landon</u> – like the other cases Pasternack relied on – involved "improper testing, and thus allege[d] underlying conduct presenting [a] classic example[ ] of negligence," unlike Pasternack's allegations against ChoicePoint. <u>Id.</u>

The New York Court of Appeals' affirmance of the Second Department's decision does not alter this Court's analysis. The underlying conduct at issue in <u>Landon</u> – the misapplication of industry-wide drug testing standards resulting in a false positive result – remains a "classic example[ ] of negligence." <u>Id.</u> ChoicePoint's alleged negligence, however, does not relate to a violation of industry-wide standards for specimen evaluation. Instead, Pasternack premises ChoicePoint's liability solely on its alleged violation of DOT regulations and guidelines. The Court of Appeals did not address the issue of whether negligence claims under New York law can be premised <u>solely</u> on an alleged violation of federal regulations or guidelines. Accordingly, the Court of Appeals' decision in <u>Landon</u> does not constitute an "intervening change in the law" warranting reconsideration of this Court's prior orders. Pasternack's motion for reconsideration will be denied.[5]

---

[5] Pasternack also argues that the Court should reconsider its prior orders in light of the D.C. Circuit's most recent reversal of the NTSB. (Pltf. Motion for Reconsideration Br. (Dkt. No. 63) at 17-18; <u>see</u> Pasternack v. Huerta, 513 F. App'x. 1, 2013 WL 1729489 (D.C. Cir. March 22, 2013). As discussed above, the D.C. Circuit found – in a March 22, 2013 summary order – that the NTSB's determination that Pasternack was not given permission to leave the collection site was not supported by substantial evidence. (Steiner Decl. (Dkt. No. 57), Ex. 5 at 2)

In denying Pasternack leave to amend the First Amended Complaint as to ChoicePoint, this Court observed that "[i]t seems clear from the regulations that Pasternack's conduct [did] in fact constitute a 'refusal to test.'" <u>Pasternack II</u>, 892 F. Supp. 2d at 556. Accordingly, the Court concluded that even "[a]ssuming <u>arguendo</u> that ChoicePoint[ ] made an 'erroneous determination' in deciding that Pasternack's conduct constituted a 'refusal to test,' no reasonable jury could find that ChoicePoint's determination that Plaintiff had engaged in a 'refusal to test' was negligent" under the regulations. <u>Id.</u>

Nothing in the D.C. Circuit's decisions – or in the extensive administrative proceedings challenging the FAA's actions – indicates that ChoicePoint's analysis and application of the

21

C.      **LabCorp's Duty to Pasternack**

Pasternack contends that LabCorp owed him a duty "to use reasonable care in

performing [its] duties, including by . . . follow[ing] applicable DOT rules." (Pltf. MTD Br.

(Dkt. No. 59) at 10)  He argues that LabCorp breached this duty by (1) not explaining the "shy

bladder" procedure to him, (2) not urging him to drink up to forty ounces of fluid and wait to

provide a urine specimen, (3) not informing him that he was required to remain at the testing site,

and (4) not informing him that leaving the test center could result in a "refusal to test."[6]  (SAC

(Dkt. No. 47) ¶¶ 46, 53)

LabCorp acknowledges that "[u]nder New York law, LabCorp, as a collector of

Pasternack's urine sample, owed him a duty of care to collect his urine specimen in a reasonable

manner." (Def. MTD Br. (Dkt. No. 58) at 14)  LabCorp notes, however, that there is no

---

applicable "refusal to test" regulation could now be found to be negligent.  To the contrary, the
D.C. Circuit has suggested that the "refusal to test" regulation is so clear and unambiguous that
"it may be . . . a strict liability provision." Pasternack, 596 F.3d at 839.  The endless
administrative proceedings and appeals in Washington reviewing the FAA's actions concerning
Pasternack – which reflect different evaluations of the proof offered during the administrative
proceedings – do not demonstrate that a reasonable factfinder could conclude that ChoicePoint
was negligent in interpreting the regulations as it did.

In any event, as Pasternack acknowledges, "this Court . . . predicated its prior decisions on other
bases as well – namely its rulings with respect to whether ChoicePoint owed Dr. Pasternack a
duty under New York law and breached that duty under the facts alleged." (Pltf. Motion for
Reconsideration Br. (Dkt. No. 63) at 18)  Because this Court has found no basis to reconsider its
determination that ChoicePoint did not owe a duty of care to Pasternack to properly interpret the
DOT regulations and guidelines – and because that determination provides an independent
ground for this Court's prior orders – the D.C. Circuit's March 2013 summary order does not
warrant reconsideration of those orders.

[6] As noted above, the DOT Regulations do not, in fact, require a collector to (1) explain the "shy
bladder" procedures; (2) tell a test subject to remain at the collection site until testing is
complete; or (3) inform the test subject that leaving the collection site before an adequate
specimen has been provided constitutes a "refusal to test," see 49 C.F.R. § 40.193, and the
Guidelines – which describe these procedures – "should not be used to interpret the legal
requirements of the actual [regulations]."  Department of Transportation, Urine Specimen
Collection Guidelines at 3 ("Introduction") (Dec. 2006); see also Fred Leroy Pasternack, 2012
WL 562137, at *8.

allegation in the SAC that LabCorp breached this duty, because LabCorp properly maintained the chain of custody of the specimen and accurately reported the negative test results. (Id. at 15) Instead, LabCorp argues, "the entire predicate for Pasternack's negligence claim" is alleged violations of the DOT Regulations and Guidelines. (Id. at 17) Relying on this Court's prior decisions, LabCorp argues that it does not, under New York law, have a duty of care to Pasternack to properly interpret and apply the DOT Regulations and Guidelines. (Id. at 16-18)

This Court finds that Pasternack's negligence claims against LabCorp are, in fact, premised solely on violations of the DOT Regulations and Guidelines. (See SAC (Dkt. No. 47) ¶¶ 45, 52 ("LabCorp breached its duty to Dr. Pasternack by mishandling the collection of his specimen and the administration of that collection by failing to comply with the DOT Regulations and the DOT Guidelines.")) Pasternack has cited no case suggesting that a violation of the DOT Regulations or Guidelines that he relies on gives rise to a negligence claim under New York law, however. Pasternack has likewise cited no case suggesting that the omissions alleged here – not explaining the "shy bladder" procedures to a test subject; not urging a test subject to drink water when he or she is unable to produce a urine specimen; not telling a test subject that he or she is required to remain at the collection site until an adequate urine sample is produced; and not informing a test subject that leaving the collection site might result in a "refusal to test" determination – give rise to a cognizable breach of the duty of care under New York law. As with his claims against ChoicePoint, Pasternack has not "identif[ied] a basis in New York law for his negligence claims." Pasternack II, 892 F. Supp. 2d at 555 n.7. In arguing that LabCorp owes him a duty of care under New York law to properly interpret and apply DOT Regulations and Guidelines addressing the "shy bladder" scenario, Pasternack has failed to state a claim that is plausible on its face. Accordingly, LabCorp's motion to dismiss Pasternack's

negligence and gross negligence claims will be granted.

### D.      Pasternack's Negligent Misrepresentation Claim Against LabCorp

The existence of a duty is also essential to a negligent misrepresentation claim:

> Under New York law, the elements for a negligent misrepresentation claim are
> that (1) the defendant had a duty, as a result of a special relationship, to give
> correct information; (2) the defendant made a false representation that he or she
> should have known was incorrect; (3) the information supplied in the
> representation was known by the defendant to be desired by the plaintiff for a
> serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the
> plaintiff reasonably relied on it to his or her detriment.

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

Pasternack alleges that "LabCorp breached its duty to [him] by failing to disclose

to [him] information that the DOT Regulations and the DOT Guidelines required it to disclose."

(SAC (Dkt. No. 47) ¶ 59)

> Specifically, . . . LabCorp, through its employees, failed to explain the "shy
> bladder" procedures to Dr. Pasternack, failed to urge Dr. Pasternack to drink up to
> 40 ounces of fluid over a period of three hours, failed to inform Dr. Pasternack
> that he was required to remain at the collection site, and failed to inform Dr.
> Pasternack that leaving the collection site before producing a sufficient urine
> sample could constitute a refusal to test.  LabCorp failed to take these steps in
> direct contravention of 49 C.F.R. § 40.193(b) of the DOT Regulations and
> Sections 8.3 and 8.5 of the DOT Guidelines.[7]

(Id. ¶ 60)  According to Pasternack, "[b]y Ms. Montalvo's conduct, statements, and

omissions, LabCorp communicated to Dr. Pasternack that the only consequence of his

leaving the facility was that LabCorp would need to contact his employer."  (Id. ¶ 61)

These factual allegations are virtually identical to those Pasternack relies upon in

support of his negligence and gross negligence claims.  As discussed above, Pasternack has not

---

[7]  In the edition of the Guidelines that was in effect when Pasternack was tested, the "shy
bladder" procedures are discussed in Section 7.  See Department of Transportation, Urine
Specimen Collection Guidelines § 7 (Dec. 2006); see also Pasternack, 596 F.3d at 838 n.2 (citing
the 2006 Guidelines as the applicable Guidelines at the time Pasternack was tested).

sufficiently alleged a basis for any duty that LabCorp owed to him to properly interpret and apply the DOT Regulations and Guidelines. Accordingly, Pasternack's negligent misrepresentation claim will be dismissed. See Kinsey v. Cendant Corp., 576 F. Supp. 2d 553, 554 (S.D.N.Y. 2008) ("Because no duty of care has been established with respect to [defendants] in connection with the claimed negligent misrepresentation and negligence, dismissal of the claims against them is appropriate."); St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd., No. 91 Civ. 0748, 1996 WL 19028, at *9-10 (S.D.N.Y. Jan. 17, 1996) (granting defendant summary judgment on negligent misrepresentation claim asserted for the first time in the Amended Complaint, where the Court previously dismissed plaintiff's negligence claim with prejudice after finding that "[p]laintiff failed to point to any duty owed" to it by defendant); Benjamin Shapiro Realty Co., LLC. v. Kemper Nat'l Ins. Cos., 303 A.D.2d 245, 245 (1st Dep't 2003) ("[T]he insurance broker of plaintiff landlord's tenant[ ]was under no duty to plaintiff and, accordingly, was not liable to plaintiff for negligent misrepresentation or negligence . . ."); cf. Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp. 2d 290, 303 n.16 (S.D.N.Y. 2006) ("Although plaintiffs, in this overbroad complaint, plead separate claims for 'negligence[' and] 'negligent misrepresentation,'. . . the factual allegations underlying plaintiffs' claim for 'negligence' center on defendants' alleged misrepresentations. . . . Thus, for purposes of this analysis, plaintiffs' 'negligence' claim may be collapsed into plaintiffs' negligence-based misrepresentation . . . claim[].").

## III.    FRAUD CLAIM AGAINST LABCORP

In his fraud claim against LabCorp, Pasternack argues that Montalvo's statements to the FAA were fraudulent, and that "[t]he FAA justifiably relied on [her] false statements in concluding that Dr. Pasternack had precluded LabCorp from fully explaining the shy bladder

procedures or informing him that leaving the LabCorp facility could be considered a refusal to test." (SAC (Dkt. No. 47) ¶¶ 66-71)

LabCorp argues that Montalvo's statements to the FAA cannot form the basis for a fraud claim brought by Pasternack against LabCorp, because Montalvo's statements were allegedly relied on by a third party – the FAA – and not by Pasternack. (Def. MTD Br. (Dkt. No. 58) at 9, 10; Def. MTD Reply Br. (Dkt. No. 61) at 8)

Under New York law,

> [i]n order to sustain a cause of action for common law fraud, the plaintiff must establish with sufficient particularity that the defendant "(1) made a material false statement; (2) knowing that the statement was false; (3) acting with intent to defraud; that plaintiff (4) reasonably relied on the false representation and (5) suffered damage proximately caused by the defendant's actions."

N.B. Garments (PVT), Ltd. v. Kids Int'l Corp., No. 03 Civ. 8041 (HB), 2004 WL 444555, at *2 (S.D.N.Y. Mar. 10, 2004) (quoting Morris v. Castle Rock Entm't, Inc., 246 F. Supp. 2d 290, 296 (S.D.N.Y. 2003)).

The Second Circuit has held that "a plaintiff does not establish the reliance element of fraud for purposes of . . . New York law by showing only that a third party relied on a defendant's false statements." Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo, 148 F.3d 194, 196 (2d Cir. 1998); see also City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 454 (2d Cir. 2008), rev'd on other grounds and remanded sub nom. Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1 (2010) ("[A]llegations of third-party reliance, however, are insufficient to make out a common law fraud claim under New York law."). Instead, a plaintiff asserting a fraud claim must "plead 'reasonable reliance on the part of the plaintiff.'" Smokes-Spirits.com, 541 F.3d at 454 (quoting Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006)) (emphasis in original).

Despite the Second Circuit's holdings in <u>Lollo</u> and <u>Smokes-Spirits.com</u>, the current state of New York law regarding the viability of a fraud claim premised on third-party reliance is not entirely clear. The "Appellate Division decisions in which the issue has arisen are . . . split on the issue[,] even in some cases within the same department and without citing contrary decisions." <u>Chevron Corp. v. Donziger</u>, 871 F. Supp. 2d 229, 257 (S.D.N.Y. 2012). Compare <u>Briarpatch Ltd., L.P. v. Frankfurt Garbus Klein & Selz, P.C.</u>, 13 A.D.3d 296, 297 (1st Dep't 2004) (holding that fraud claims were properly dismissed where "[t]he only alleged misrepresentation concerned a letter from defendant . . . to a third party, on which plaintiffs [could not] and [did] not claim reliance"), and <u>Escoett & Co. v. Alexander & Alexander, Inc.</u>, 31 A.D.2d 791, 791 (1st Dep't 1969) (holding that defendant could not maintain a counterclaim for fraud where the "representations of which the defendant complain[ed] were made to third parties and not to it, and those representations were relied upon by those third parties and not by it"), <u>with</u> <u>Buxton Mfg. Co., Inc. v. Valiant Moving & Storage, Inc.</u>, 239 A.D.2d 452, 453-54 (2d Dep't 1997) (finding on motion for summary judgment that defendant could be held liable for fraud, where defendant misrepresented to the Department of Agriculture that he had already paid plaintiff – a subcontractor – in full, which resulted in defendants receiving funds that the Department of Agriculture would have otherwise withheld until plaintiff's claim was resolved) and <u>Desser v. Schatz</u>, 182 A.D.2d 478, 479-80 (1st Dep't 1992) (denying motion to dismiss fraud claim where plaintiff alleged that defendant falsely represented to a bank that it had paid the mortgage executed to plaintiff in full, causing the bank to wrongfully extinguish plaintiff's interest).

"[T]he federal district courts have also been divided on the issue." <u>Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.</u>, 896 F. Supp. 2d 198, 205 (E.D.N.Y. 2012).

27

Compare Siotkas v. LabOne, Inc., 594 F. Supp. 2d 259, 275-76 (E.D.N.Y. 2009) (dismissing fraud claims by airline employees – who were accused of substituting their urine specimens – against a drug testing laboratory, where the laboratory's alleged misrepresentations were made to plaintiffs' employer, but plaintiffs themselves "in no way relied on [the laboratory's] reports"), Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V., 425 F. Supp. 2d 458, 473 (S.D.N.Y. 2006), vacated in part on other grounds, 623 F.3d 61 (2d Cir. 2010) and aff'd, 400 F. App'x 611 (2d Cir. 2010) ("A claim for fraud cannot lie under New York law where the alleged misrepresentation is made to and relied upon by a third party, but not the plaintiff."), Trepel v. Dippold, No. 04 Civ. 8310 (DLC), 2006 WL 3054336, at *5 (S.D.N.Y. Oct. 27, 2006) (quoting Lollo, 148 F.3d at 196) ("In order to establish fraud based on misrepresentations directed at a third party, however, plaintiff must 'establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him.'"), Morris v. Castle Rock Entm't, Inc., 246 F. Supp. 2d 290, 296 (S.D.N.Y. 2003) ("[T]hird-party reliance is not enough to sustain a claim for common law fraud."), and Falise v. Am. Tobacco Co., 94 F. Supp. 2d 316, 354 (E.D.N.Y. 2000) ("As a general proposition, New York requires the party seeking recovery for an action sounding in common-law fraud to establish that he was misled, rather than merely alleging that the misrepresentations and omissions in question were relied on by a third party.") (emphasis in original), with My First Shades v. Baby Blanket Suncare, 914 F. Supp. 2d 339, 352 (E.D.N.Y. 2012) ("While Mercer is correct that Plaintiffs never pled their own reliance on misrepresentations, New York allows plaintiffs to bring claims based on a theory of third party reliance."), Prestige Builder & Mgmt. LLC, 896 F. Supp. 2d at 204-05 ("[T]he third-party reliance doctrine is good law in New York. . . ."), Chevron Corp., 871 F. Supp. 2d at 256-57 (concluding that New York law allows for "recovery for common law fraud based on third party

reliance"), N.B. Garments (PVT), Ltd., 2004 WL 444555, at *3 (holding that a fraud claim premised on third-party reliance "raises a cognizable claim under New York law"), and Hyosung Am., Inc. v. Sumagh Textile Co., Ltd., 25 F. Supp. 2d 376, 383-84 (S.D.N.Y. 1998) (citing Buxton, 239 A.D.2d at 453-54; Desser, 182 A.D.2d at 479-80 ) ("[A] plaintiff may state a claim for fraud where a defendant's misrepresentation caused a third party to extinguish its financial obligation to the plaintiff.").

As described above, several courts in this circuit have allowed fraud claims premised on third-party reliance to proceed, even after the Second Circuit's decisions in Lollo and Smokes-Spirits.com. These courts have pointed to three New York Court of Appeals cases from the late 1800s – Eaton, Cole & Burnham Co. v. Avery, 83 N.Y. 31 (N.Y. 1880), Rice v. Manley, 66 N.Y. 82 (N.Y. 1876), and Bruff v. Mali, 36 N.Y. 200 (N.Y. 1867) – as standing for the proposition that a third party's reliance is sufficient to state a claim for fraud under New York law. See Chevron Corp., 871 F. Supp. 2d at 256-57 (quoting Levesque v. Kelly Commc'ns, Inc., No. 91 Civ. 7045 (CSH), 1993 WL 22113, at *6 (S.D.N.Y. Jan. 25, 1993)) ("While these [New York Court of Appeals] cases were decided in the last century, they have not been overruled, and this Court is bound to 'defer to the voice of th[e] state's highest court – however antiquated its view of the law may seem.' . . . [T]his Court concludes that the New York Court of Appeals' previous decisions allowing recovery for common law fraud based on third party reliance remain authoritative . . .'"); see also Prestige Builder & Mgmt. LLC, 896 F. Supp. 2d at 203; N.B. Garments (PVT), Ltd., 2004 WL 444555, at *3. Several New York Appellate Division decisions have likewise relied on these Court of Appeals decisions in sustaining fraud claims based on third-party reliance. See Buxton, 239 A.D.2d at 453-54; Desser, 182 A.D.2d at 479-80.

29

Here, this Court concludes that Pasternack may not rely on the three New York Court of Appeals cases – Eaton, Bruff, and Rice -- to salvage his fraud claim against LabCorp. In Eaton and Bruff, the Court of Appeals addressed the question of whether a defendant could be held liable for misrepresentations made to a third party, which were then communicated by the third party to the plaintiff. In both cases, the defendant intended for the misrepresentations to be communicated to the plaintiff, knowing that the plaintiff would rely on those misrepresentations and thereby suffer injury. In Eaton, the defendant made false statements about his firm's financial condition to a mercantile agency. Eaton, 83 N.Y. at 33. The agency communicated this information to the plaintiff, who – relying upon it – sold goods to the defendant on credit. The defendant did not pay for the goods, however, and plaintiff sued to recover their cost. Id. The court held that "if A. makes [a false] statement to B. for the purpose of being communicated to C.[,] or intending that it shall reach and influence him, [A.] can be . . . held [liable to C.]." Id. at 35. Similarly, in Bruff, the defendants – officers of a company – issued stock certificates that they knew to be valueless, and a third party company sold the certificates to plaintiff. Bruff, 36 N.Y. at 200-02. The defendants argued that they could not be held liable to the plaintiff for misrepresentations regarding the value of the stock, because the stock certificates had been sold to the plaintiff by a third party. Id. at 204. The court rejected this argument, holding that "the defendants, having issued the false certificates of stock, authenticated by them as genuine, and cast them upon the market with fraudulent intent, [were] liable to every holder to whose hands they may come by fair purchase." Id. at 206.

In sum, neither Eaton nor Bruff addresses the issue of third-party reliance. In each case, it was the plaintiff who relied on the defendant's misrepresentations to his detriment. The third party merely served as a conduit for the misrepresentations to be relayed from the

defendant to the plaintiff, so that the plaintiff would be induced to act on them.  These cases are therefore not on point.

Third-party reliance was also not at issue in Rice.  In Rice, "plaintiffs had made an agreement with one Stebbins to purchase from him a large quantity of cheese, to be delivered at a future day." Rice, 66 N.Y. at 83.  Defendant – pretending to be plaintiffs – cancelled the order, so that he could buy the cheese for himself.  Id. at 84.  The agreement between plaintiffs and Stebbins was not legally enforceable – because it did not comply with the statute of frauds – but the court found that Stebbins would have sold the cheese to plaintiffs but for defendant's misrepresentations.  Id. at 83-84.  The question that the court addressed was whether plaintiffs had suffered a legally cognizable injury given that plaintiffs and Stebbins had not entered into an enforceable contract.  Id. at 84-85.  The Court of Appeals held that plaintiffs could recover from defendant, because plaintiffs had in fact been injured by defendant's misrepresentations, given that Stebbins would have sold plaintiffs the cheese but for defendant's misrepresentations.  Id.

It is true that the Rice court characterizes plaintiffs' cause of action as a fraud claim.  The opinion also contains the following language, which several courts have read to suggest that third party reliance is sufficient to state a fraud claim:  "The mere forms adopted for the perpetration of frauds are of little importance; it matters not whether the false representations be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury, or whether it be direct or indirect in its consequences." Id. at 87.

The issue before the Rice court, however, was whether plaintiffs had suffered a legally cognizable injury, and not whether a fraud claim could be premised on misrepresentations made to a third party.  Moreover, it must be acknowledged that the discussion of fraud in Rice reflects an antiquated and simplistic view of the elements of a fraud claim that has long since

31

been superseded. For example, the <u>Rice</u> court states that only two elements must be pled to state a fraud claim: fraud and damage. <u>See</u> <u>id.</u> at 84 ("when these two [ – fraud and damage – ] concur[,] an action lies"). More modern cases make clear that the tort is not so simply stated. <u>See</u>, <u>e.g.</u>, <u>Eurycleia Partners, LP v. Seward & Kissel, LLP</u>, 12 N.Y.3d 553, 559 (N.Y. 2009) ("The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."). To read <u>Rice</u> as articulating a rule for the reliance element of a modern fraud claim – when that case contains no discussion of reliance and turns on the issue of whether plaintiffs have suffered a legally cognizable injury – appears ill-advised.[8]

        Given that the New York Court of Appeals has not directly addressed this issue, that the Appellate Division courts are divided, and that many of the Appellate Division cases that have endorsed third-party reliance have mistakenly relied on <u>Eaton</u>, <u>Bruff</u>, and <u>Rice</u>, this Court will adopt the interpretation of New York law that is set forth in <u>Lollo</u> and <u>Smokes-Spirits.com</u>. That interpretation holds that "a plaintiff does not establish the reliance element of fraud for purposes of . . . New York law by showing only that a third party relied on a defendant's false

---

[8]  The issue that the <u>Rice</u> court considered – whether a plaintiff could recover for interference with a business relationship in the absence of an enforceable contract – has been addressed through the evolution of a distinct cause of action under New York law:  tortious interference with business relations. <u>See</u> <u>AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.</u>, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *7 (S.D.N.Y. May 22, 2003) ("[I]n the event that a tortious interference [with contract] claim would fail because the underlying contract was unenforceable, an alternate claim of tortious interference [with prospective business relations] claim would become viable."). Although the <u>Rice</u> court described the cause of action in that case as a fraud claim, today the applicable cause of action would be tortious interference with business relations. <u>See</u> <u>Purgess v. Sharrock</u>, 33 F.3d 134, 141 (2d Cir. 1994) ("In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship."). This merely highlights the danger in relying on <u>Rice</u> for purposes of determining the requisite elements of a modern day fraud claim.

statements." Lollo, 148 F.3d at 196. Because the SAC alleges that only the FAA – and not

Pasternack – relied on LabCorp's alleged misrepresentations, Pasternack's fraud claim will be

dismissed.

## IV.   INJURIOUS FALSEHOOD CLAIM AGAINST LABCORP

Pasternack also asserts a claim for injurious falsehood against LabCorp, on the

theory that Montalvo's "statements to the FAA investigators concerning Dr. Pasternack's urine

specimen collection" were relied on by the FAA, and

> [a]s a direct and proximate result of [those] false statements, and the FAA's
> reliance thereon, Dr. Pasternack . . . suffered special damages in the form of lost
> prior and present earnings as both a pilot and an AME; lost future earnings as
> both a pilot and an AME; expenses, including attorneys' fees, associated with
> challenging the revocation of his airman's certificates and termination of his
> AME designation through the administrative process; frustration, anger,
> humiliation, and embarrassment; and other non-pecuniary damages.

(SAC (Dkt. No. 47) ¶¶ 73-76)

### A.   Legal Standard

"The elements of a claim of injurious falsehood, which is also called product

disparagement or trade libel, are: (i) falsity of the alleged statements; (ii) publication to a third

person; (iii) malice; and (iv) special damages." Daniels v. St. Luke's-Roosevelt Hosp. Ctr., No.

02 Civ. 9567 (KNF), 2003 WL 22410623, at *7 (S.D.N.Y. Oct. 21, 2003). "Trade libel or

product disparagement is an action to recover for words or conduct which tend to disparage or

negatively reflect upon the condition, value or quality of a product or property [or service]."

Angio-Med. Corp. v. Eli Lilly & Co., 720 F. Supp. 269, 274 (S.D.N.Y. 1989); see also Ruder &

Finn Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 670-71 (N.Y. 1981) ("Where . . . the

statement . . . denigrat[es] the quality of the business' goods or services, it could support an

action for disparagement, but will do so only if malice and special damages are proven.").

"Language which merely disparages a product [or service] is not actionable unless special

33

damages are pleaded and it appears that such damage is a natural and immediate consequence of the disparaging statements." Angio-Med. Corp., 720 F. Supp. at 274.

### B.  Special Damages

LabCorp argues that "Pasternack's injurious falsehood claim is . . . defective because it fails to particularize any special damages." (Def. MTD Br. (Dkt. No. 58) at 13)

"The requirement of pleading and proving special damages is applied strictly [under New York law]. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity." Daniels, 2003 WL 22410623, at *7 (internal citation omitted). "[R]ound figures, with no attempt at itemization, must be deemed to be a representation of general damages." Drug Research Corp. v. Curtis Publ'g Co., 7 N.Y.2d 435, 441 (N.Y. 1960).

Here, "Plaintiff's special damages claim, premised [primarily] on [his] loss of employment and the salary therefor, is not 'fully and accurately stated,' as required under New York law." Daniels, 2003 WL 22410623, at *8 (quoting Drug Research Corp., 7 N.Y.2d at 441). Pasternack has included no monetary figures at all in the SAC, let alone an "itemization" of special damages.[9] While the types of damages Pasternack pleads "may be actionable under an injurious falsehood theory . . . , [a] plaintiff's complaint [is] nevertheless deficient [if] he fail[s] to identify his special damages with sufficient particularity." Rall v. Hellman, 284 A.D.2d 113, 114 (1st Dep't 2001) (internal citations omitted) ("As to plaintiff's allegation that he incurred costs . . . , this allegation was deficient as it failed to identify with any particularity the actual damages incurred."); see also Nyack Hosp. v. Empire Blue Cross & Blue Shield, 253 A.D.2d

---

[9]  Pasternack's attempt to particularize special damages in his opposition papers (Pltf. MTD Br. (Dkt. No. 59) at 24-25) does not remedy this deficiency. See, e.g., Southwick Clothing LLC v. GFT (USA) Corp., No. 99 CV 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts . . . in plaintiff['s] opposition papers, and hence such new allegations . . . should not be considered in resolving the motion.").

743, 743 (2d Dep't 1998) ("[P]laintiff's general allegations of lost revenues and 'increased massive staff effort' did not satisfy the requirement of pleading special damages with particularity."); L.W.C. Agency, Inc. v. St. Paul Fire & Marine Ins. Co., 125 A.D.2d 371, 373 (2d Dep't 1986) ("The general allegation that [plaintiff] was deprived of the commission . . . [for a year] as well as the allegations of losses of undefined future commissions were inadequate to plead special damages [for a tortious interference claim]."). Pasternack has not alleged special damages with the requisite specificity, and this pleading defect is sufficient, standing alone, to justify dismissal of his injurious falsehood claim. See Daniels, 2003 WL 22410623, at *7.

### C. Merits of the Injurious Falsehood Claim

Pasternack requests leave to amend his injurious falsehood claim if the Court finds – as it has – that special damages are not sufficiently pled. (Pltf. MTD Br. (Dkt. No. 59) at 25) District courts "ha[ve] broad discretion in determining whether to grant leave to amend," Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000), and leave to amend should generally be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may properly deny leave to amend, however, in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of New York, No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile."). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss." Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002). Here, amendment of Pasternack's

35

injurious falsehood claim would be futile, because that claim suffers from defects other than the failure to adequately plead special damages.

A claim for injurious falsehood is "confined to [statements] denigrating the quality of [a plaintiff's] goods or services," Ruder & Finn Inc., 52 N.Y.2d at 670; see also Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC, No. 11 Civ. 3327 (ER), 2013 WL 417406, at *16 (S.D.N.Y. Feb. 4, 2013) (quoting Berwick v. New World Network Int'l, Ltd., No. 06 Civ. 2641 (JGK), 2007 WL 949767, at *15 (S.D.N.Y. Mar. 28, 2007)) (emphasis omitted) ("'[A]n injurious falsehood is confined to [a statement] denigrating the quality of the plaintiff's . . . goods or services.'"); Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 470 (S.D.N.Y. 2006) (quoting Ruder & Finn Inc., 52 N.Y.2d at 670) ("The New York Court of Appeals has stated that injurious falsehood lies where 'the statement is confined to denigrating the quality of the [plaintiff's] business' goods or services.'") (alteration in original), and Montalvo's statements to the FAA did not denigrate the quality of services Pasternack provided.

Montalvo's statements to the FAA concerned Pasternack's behavior at the collection site, not the quality of any "goods or services" that he provided. Even if these statements had a downstream impact on his ability to work as a pilot or an AME, this does not transform them into statements about the quality of his services in those capacities. See Henneberry, 415 F. Supp. 2d at 471 n.26 (finding that the New York Court of Appeals has adopted a narrow definition of injurious falsehood, limited to "disparagement of 'the quality of [a] business' goods or services'" and not merely "disparagement . . . made as to [a] 'plaintiff's business'") (emphasis omitted); In Touch Concepts, Inc. v. Cellco P'ship, 949 F. Supp. 2d 447, 483-85 (S.D.N.Y. 2013), adhered to on denial of reconsideration, No. 13 Civ. 1419 (PKC), 2013 WL 6182949 (S.D.N.Y. Nov. 18, 2013) (finding that claim was not in the nature of injurious

36

falsehood where "[t]he statements at issue each tend[ed] to call into question Zcom's integrity, not the quality of Zcom's . . . products and services"); <u>Korova Milk Bar of White Plains, Inc.</u>, 2013 WL 417406, at *4, *17 ("Here, statements made to third parties . . . include . . . Defendants providing the [police] with unspecified 'false information' which prompted [them] to conduct a raid at [plaintiff's bar, which plaintiff alleges was intended to result in revocation of the bar's liquor license] . . . These alleged false statements, even given the import that Plaintiff ascribes to them, do not relate to any 'goods or services' provided by [plaintiff] and thus cannot support an injurious falsehood claim."). Rather, statements concerning Pasternack's compliance or refusal to comply with LabCorp procedures describe the personal behavior of Pasternack himself, and therefore do not give rise to a claim for injurious falsehood. <u>See</u> <u>Angio-Med. Corp.</u>, 720 F. Supp. at 274 ("If, however, the disparaging statements impeach the . . . integrity of the plaintiff himself . . . [t]he action would . . . [not] qualify as . . . trade libel."). Accordingly, LabCorp's motion to dismiss Pasternack's injurious fraud claim is granted, without leave to amend.

## CONCLUSION

For the foregoing reasons, Defendant LabCorp's motion to dismiss the Second Amended Complaint is granted, and Pasternack's motion for reconsideration of this Court's August 1, 2011 and September 6, 2012 decisions is denied. The Clerk of the Court is directed to terminate the motions (Dkt. No. 56, 62) and close the case.

Dated: New York, New York
        September 28, 2014                    SO ORDERED.


                                             _____
                                             Paul G. Gardephe
                                             United States District Judge